**EXHIBIT 1**

# TIRE FAILURE ANALYSIS REPORT

In the case of:

## Moreno v BFS

Introduction

Passenger & Light Truck Tire Manufacturing Process

Passenger & Light Truck Tire Design

Examination

History

Analysis

Summary

C.V.

Fee Schedule

Publications

Deposition Testimony History

References

Appendix

Prepared:
07-MAR-08

Prepared for:

*Troy Cottle*

Troy Cottles
25884 Katpaugh Lane
Toney, AL 35773

Roger Braugh
900 Frost Bank Plaza
802 N. Carancahua St.
Corpus Christi, TX 78470

DE SANTIAGO, C.
1586-000478

1

## INTRODUCTION

I am by training and experience a tire failure analysis and tire design expert. I have been
employed in the tire industry for 17 years with Dunlop Tire Corporation (later Goodyear-Dunlop
Tires North America, Ltd.), designing, manufacturing, and testing steel belted radial tires and
others. I have also examined numerous tires that have been involved in tread separation
accidents since leaving my employment in the tire industry. My C.V. is attached.

## THE TIRE MANUFACTURING PROCESS (passenger and light truck)

The raw materials required to produce a steel-belted radial tire include both synthetic and natural rubber types. In all, a single tire may have more than thirty five different processed component parts.

The tire will include chemicals to assist in the bonding of one component to another, to reduce the effects of oxygen and ozone degradation, to accelerate and activate chemical bonds and molecular cross-linking of polymers and fillers and salts, and to improve the process-ability of the rubber compounds through the Banbury mixing process, rubber mills, and extruders.

Ingredients called fillers are the building blocks of the rubber formulas. These include clays, carbon blacks, zinc oxides, silica, and others. They each provide strength to the rubber formulation, as well as other properties.

The Banbury is a giant blender which mixes rubber in large batches. Operators use a batch recipe for a specific rubber formulation type and add the proper number of bales of natural rubber, synthetic rubber, aromatic or naphthenic oils, wax, sulfur, and other curatives onto a weigh station conveyor which is fed into the Banbury. Loose items like carbon black or silica are conveyed in from outside silos to reduce the environmental impact of handling the dusts. Within the Banbury high heat and pressure is applied to the batch.

The rubber batch is removed hot from the Banbury, but as it cools it is processed as slabs of rough rubber stock.

The slab stock is further processed on breakdown mills, which masticate the rubber between pairs of rollers continuously until the compound can be properly worked onto another mill type called a feed mill. The feed mill prepares the milled stock to be fed through an extruder die to become components such as tread or sidewall stock.

Other rubber types are used for skim on fabrics used in the tire, such as polyester, nylon, and rayon. These could be nylons used as cap plies, body plies, bead bundle wraps or flippers, sidewall inserts, or chafers. In today's radial passenger tires polyester and rayon are more highly utilized as body ply fabrics than nylon. The processing of rayon is not as environmentally friendly as polyester, but continues to be used heavily in the European market. Though some rayon is used as ply material in North American produced tires, the expansion is in polyester. Still other rubber formulations are used as skims on the steel belts.

After all calendered fabrics, extrudants, and calendered rubber are processed the tire can be assembled.

DE SANTIAGO, C.
1586-000480

3

## Bead

Once the correct links are inserted on the bead winder to hold the desired inside bead diameter, the specified bead configuration can be produced.  The strands of wire are run through a cold-feed extruder to coat the wires in a layer of rubber.  Whether by a taped bead assembly (turns and strands) or by a single wound bead (hexagonal or polygonal), the final bead assembly is a hoop of layered steel wires embedded in rubber.

Some manufacturers staple the loose end to the rest of the bundle.  Some spiral a nylon thread around the splice point at the last wire end.  Some wrap the entire wire bundle length in a coated nylon wrap.  While some have increased the tack properties of the rubber coat sufficiently to keep the last turn of wire(s) from lifting off the hoop during tire building and curing.

The next process might be the application of a bead apex to the bead bundle.  With a bead bundle width of four, five, six, or seven strands wide, a natural void occurs above the bead due to the difficulty of getting the plies to conform around the square or polygonal shape of the bead. To remedy this, a rubber filler (apex) is installed atop the bead bundle.  Dimensionally, these can range from as small as one half inch in height to several inches tall.  Of course, the smaller the apex, the less performance it actually contributes in its ability to stiffen the lower sidewall and damp inputs, as discussed earlier under the tire design heading.

To countermeasure against the apex separating from the bead bundle in tire building, curing, or in-field service, some manufacturers utilize a coated nylon "flipper" material to wrap the bead bundle and adhere to the apex, reducing the likelihood of damage due to the handling involved in the tire manufacturing process, when the components are still "green" and not chemically bonded to each other during the curing of the tire.

At the tire building machine two bead assemblies (bead and apex), would be set in retainers outside the main tire building drum.  These are held in place until after the innerliner and plies are assembled, then the beads are drawn in to the sides of the drum above the edges of the innerliner and plies.  At this point the innerliner and ply edges would be folded over the bead (creating the ply turn ups for the green tire and locking the beads into position).

## Innerliner

To eliminate the inner tube in radial tires, the innerliner was developed to sustain inflation pressure in the tire and be a rubber veneer cured directly to the plies.  In the early 1980s, the innerliner was for many manufacturers purely a natural rubber component—the result being unfavorable long-term air retention.  In the worst cases, new tires mounted on OE vehicles would be flat again before the vehicle left the shipping lot outside the vehicle manufacturer's property.

Clearly, synthetic chemical agents were required to assist the air retention properties.  Halobutyls have since been used in higher and higher concentrations to improve resistance to air permeation. Chloro-butyls and bromo-butyls are popularly utilized in many of today's radial passenger and light truck tires.

DE SANTIAGO, C.
1586-000481

4

The innerliner is prepared as a flat sheet. Some manufacturers may produce innerliner as a single pass material with a specified gauge. Others prepare it in two passes of nearly equal gauge resulting in the final specified gauge. While yet others differ the chemical composition of the two layers—one a natural rubber barrier and the other a butyl layer.

The innerliner is supplied to the building machine in a roll of fabric or vinyl liner. It is pulled through the servicing trays on a building machine and applied in one or more rotations around an expanded drum. Some tire makers would consolidate a chafer material (fabric or gum) to the ends of the innerliner width, in order to place this material in proper position to protect the tire from excessive rim chafing in use.

At the building machine the first component to be applied to the drum is the innerliner. Once the innerliner is applied to the drum and the drum is rotated one revolution (two if the innerliner gauge is processed at half gauge to eliminate a set up change in the area of innerliner manufacture), special care has to be taken with the innerliner to ensure the splice is properly sealed.

In the green state, the only seal of the splice is the tack level the innerliner has to itself, which should be assisted by roller stitching the splice location. If this is not properly done, the splice may open later to allow a conduit for oxidative attack on the internal components of the tire, resulting in chemical aging and degradation.

Also, if the splice is too blunt (lacking a skive angle), it creates a dam for trapped air during the curing process. This also can gather at the splice location to create an opportunity for air infiltration throughout the tire's use.

## Plies

The body plies of the tire are also delivered to the tire building machine in a liner roll. In a two-ply tire, the plies are typically cut at a different width from each other. Care must be given to maintaining a minimum distance between the turn up heights of each ply (or any other component) so as not to create coincidental endings of materials. These act as hinge points during the flexing of the tire's sidewall region.

Establishing the first ply as the wider ply allows for the outer ply turn-up to protect all internal fabric endings beneath. This technique is not necessarily universally applied by the different tire manufacturers, however. Both plies typically are wider than the innerliner widths in a 2-0 construction.

When speaking of "radial" tires, we are speaking of the direction of the body plies in relation to the direction of travel. One convention of identifying the angle of radial tires is to specify the plies as being at 90 degrees within the tire.

The plies are applied over the innerliner on the building drum, (rotated) and spliced to ensure the plies do not "pop open" during the rest of the building sequence or at the time of curing. An inadequate splice will result in tire failure along the ply splice.

DE SANTIAGO, C.
1586-000482

5

## Sidewalls

The sidewalls which have been extruded through single, dual, triple, or quadruple head extruders are delivered to the building machine in rolls. These might be supplied to the building machine in separate rolls.

The use of a single-head extruder would imply the entire sidewall consisted of only one rubber compound. In a typical case, a sidewall formed through a dual extruder head may have a sidewall compound and a rim protector compound in the lower sidewall region. A triple extrusion might consist of a separate compound to be positioned under the belt edges as a belt cushion, a sidewall compound, and a rim protector compound. An example of a quadruple-head extruder would be the same as the three head extrusion, with perhaps a white sidewall compound included for the raised lettering or stripe in the tire.

Once the plies have been turned over the bead, the next component to be assembled is the sidewall. The drum is again rotated and the sidewalls are cut on a skive angle by a heated knife and the splice is stitched. After this step, automatic stitchers on the building machine may be used to increase the green tack among all components, while removing as much trapped air as possible between layers.

The resulting assembly resembles a rubber tube or sleeve. In the next stage the tire will be shaped more closely to the appearance of a final cured tire.

This completes what is termed the "first stage" building process. From here, the first stage body carcass is transferred to the second stage machine, unless a single-stage building machine is being utilized, where the same drum is used to complete all assembly.

At the second stage machine, the steel belts, nylon cap plies, and tread piece are applied onto a drum which is set to a larger diameter, in order to be later transferred onto the inflated first stage carcass.

## Steel Belts

There are basically two methods in use to prepare a standard steel belt. The older method entails processing a roll of calendered steel and cutting six to nine inch pieces of the belt on a given bias angle. These individual strips are then zipper-stitched together to create a longer roll of belt material at the desired sheet width and belt angle to be used for a specific tire.

Prior to rolling up the stitched belt segments, a belt edge gumstrip or belt wedge component might be included on the first belt to consolidate tasks.

A length of this belt material adequate to cover the circumference of a tire might have six to nine wire splice locations. Some of the shortcomings of this technique are:

DE SANTIAGO, C.
1586-000483

6

- Poor guide control on the zipper-stitcher operation allows for "floating" of the individual belt pieces along the conveyor. This creates irregular belt edge endings from one piece to the other. In the finished tire, these create opportunities for wires in the same belt to come into contact with each other during flexion. Obviously, this creates some level of "snaking" between belts, which can result in belt to belt contact.

- Multiple cut lengths of wire in each belt segment results in multiple wires per tire having inadequate rubber skim coverage.

- Multiple wire overlaps due to the splicing of those six to nine belt splices per belt means one or more wires in each segment per belt can have wire to wire contact, which eventually wears through any available belt skim in loaded tire operation.

- Shelf life is an issue with this technique because the time it takes to produce a belt length for even one tire is lengthened as compared to more recent methods. This involves the belt remaining in the roll or liner longer than other components, which in many cases results in liner pattern marks on the belt skim, which impede proper bonding to the next belt's skim during tire curing, resulting in imminent belt separation.

- Humidity-controlled environment also is an issue, because many times this equipment was not installed within the temperature and humidity controlled portions of the manufacturing facility resulting in early sulfur bloom of the belt skim stock and moisture attack on the exposed steel wires, both of which are known to result in a failure to create a properly bonded belt system in the tire.

- Wire spacing within a Steelastic belt is often inconsistently spaced. These irregularly spaced wires ultimately result in large enough voids between belts to require the available skim to flow into the voids during the curing process. The flow of skim into open splices or irregular wire spacings creates a reduction in the available skim gauge in those specific areas, which has generated unnecessary heat within the belt systems causing belt to belt separations in tires.

Another technique for preparing steel belts which has been available to the industry since at least the late-1980s, is the use of larger creel calenders to uniformly space the belt wires and to handle the wires in a temperature and humidity-controlled area. The creeled wires are fed through a combset (approximately four to six feet wide) to a mill where the skim is embedded into and onto the wires. This is rolled and delivered to a shear cutter which has been set to the desired belt angle. The belt is cut to width on the proper angle. Normally one cut is sufficient for the circumference of a tire of smaller overall diameter.

This method produces a uniform belt edge position for the entire cut. It involves only a single splice in the first belt and a single splice in the second belt. The belt edge gumstrip or belt wedge can also be consolidated on the rollup of the cut belts in the liner. Belt cuts for multiple tires can be achieved in the same time it takes to assemble several belt segments into a single tire belt on the Steelastic-type equipment, so that not only is their efficiency in the operation, but the belt material is not exposed to environmental effects any longer than necessary.

On the second stage drum, the first belt (perhaps with belt wedges) is applied first. The drum is rotated and the belt is cut with a hot knife along the path of the steel cords. The ends are butt-spliced together.

The second belt is now applied centrally over the first, rotated, and spliced the same as the first belt. In order to ensure proper positioning of the steel belts, a guidance system is normally applied to reduce variation in component placement. Such a guidance system may consist of automated component placement, laser lights to spot proper drum locations for components, etc. in order to maintain consistency between constructive features in the tire.

## Nylon Cap Ply/Edge Bands

By whatever means used (jointless nylon band or full belt widths of nylon), the next component to be applied is the nylon cap ply and or nylon edge bands.

If using full widths, the material is supplied on a servicing tray on the backside of the second stage building machine drum. If nylon band strips are being used, the applicator head might be behind the operator near the tread servicer. By attaching a strip to the edge of the first belt on the building drum and using multiple drum rotations to tension the nylon as it winds on, the applicator head either steps across to cover the steel belts in increments or moves on a screw so that the spiraling continues, according to the patented techniques being utilized by a particular tire manufacturer.

## Tread

Once the belts and/or nylon is applied, the last component to be assembled is the tread. Typically, rather than rolling a continuous piece of tread into a fabric or vinyl roll, these are cut to length and stacked in booking trucks and pulled to the second stage machine. The tread may consist of a tread cap on top, a tread base compound, a tread wing which is chemically compatible with the sidewall compound for tread edge adhesion, and an undertread.

The operator selects a tread and places it on the service conveyor which may have centering guides attached. The front edge of the tread is attached to the belt or nylon surface on the drum and the drum is rotated a full revolution. The tread splice is made by hand and should be further stitched to maximize green tack.

DE SANTIAGO, C.
1586-000485

8

Now, the first stage carcass is fitted over an inflatable drum or chuck which will crown the center of the plies and hold the beads in place. Meanwhile, a transfer ring moves over the second stage drum and spring or pneumatically forced segments extend toward the drum to make contact with the belt/nylon/tread package. Once the segments are in place, the drum collapses, leaving the belt package suspended in the transfer ring segments. The transfer ring then glides over the inflated first stage tire carcass where the belt package is centered by laser indicators, released, and then dynamically stitched onto the carcass under some pressure.

At this point the green tire is completely assembled. The next step in the process would be to prepare the tire for curing. This step includes inside and/or outside tire paints, which protect and lubricate the innerliner and ply cords from the curing mechanisms as well as reducing the propensity for trapping air during the cure. These paints also assist in covering voids in the tire surface and allowing the air inside and on the surface of the tire to be evacuated more easily. Once the paint is dry, the tire can be cured.

The exact orientation of one component's splice in relation to others has been found to be significant to ride disturbances such as vibration and ride harshness. Due to the potential for this to generate complaints by customers, techniques to stagger the number of component splices around the tire are used.

## Cure

Curing is another area in most tire plants in which at least some of the conditions are standardized for efficiency. In the case of many tire plants the curing factor which is most often standardized is the platen and curing temperature. For example, it would not be unusual for all tires produced in a particular type to be cured at a fixed temperature above 300 degrees, leaving mainly the amount of time as the variable factor for each specific design.

Prior to curing the tire, cure studies are typically conducted in which multiple thermocouples are placed on a green tire. Additional layers of tread stock are added to the surface to allow thermo-coupling for some depth, after this the tire is cured. By sectioning the tire, analysis of the point at which the rubber components are cured without the presence of porosity can be determined. This information will be used to formulate the cure specification for this tire.

Due to the high temperature curing that the tire undergoes, ultimately many of these different rubber components are bonded together in such a way that the individual parts meld together. The desired result of curing is not that the rubber components blend to the extent that they lose chemical integrity or identity, but that the rubber to rubber, rubber to fabric, and rubber to steel bonds produce an intact tire system by the degree to which each component becomes melded to the other. The desired result is that no interface between the components being bonded is weaker than the strength of the individual component, else a failure at that component interface is inevitable, and must be remedied.

Once the tire is cured, it will continue through an inspection process which might include X-ray, uniformity measurement, balance check, sidewall undulation measurement, and/or white sidewall buffing. There should be several opportunities before finally being delivered to a warehouse location for the tire to receive visual, tactile, and instrumented inspection.

# DESIGNING A PASSENGER OR LIGHT TRUCK STEEL-BELTED RADIAL TIRE

Simply stated any tire's two main functions are to allow ease in rolling and to allow control of the mass of the vehicle on which it is mounted. This control translates into degrees of precision or handling response (ultra high performance tires being on the upper end of the scale) and the ability to stop (braking) the mass on different surface types in a variety of service and climatic conditions. In the most general of terms, almost every other performance expectation is a desired derivative of those two main functions, including the ability to sustain a certain load and inflation pressure and the ability to continue in service for a reasonable period of time without presenting safety-related modes of failure at the end of serviceable life, such as a tread separation. Consideration of these two primary functions should be incorporated into the tire design process.

As a practical matter, tire designers are given some latitude with variations in tread compounding and gauging, some sidewall compounding options and gauging, and usually fewer options for bead apex compounding. Usually a tire designer can expect more freedom to establish the belt widths, angles, and density, adoption of nylon, ply turn up heights and perhaps type of ply cord selected, and the dimensions of the bead apex. Beyond these, such items as innerliner, bead core coating, nylon chafer skim compound, rim protector compound, ply skim compound, belt skim compound, belt wedge compound, nylon skim compound, belt cushion compound, tread wing compound, and undertread compound are virtually never adjusted by individual designers or for specific tire design programs. These type rubber components (as well as body ply types, nylon types, and to some extent the types of steel used in bead bundles, steel belts, and sidewall inserts) are most often incorporated into every (or nearly so) tire of a given type produced in a given tire plant.

In manufacturing a tire, the beads, innerliner, body plies, and sidewalls are typically assembled in the first stage and the belts, nylon, and tread are assembled over the first stage carcass in the second stage tire building process. This separation of components by stage is also a point of consideration for the design engineer. It is somewhat rare to achieve the total performance requirement in the very first attempt, especially for OE applications. However, the designer must consider that it is somewhat easier to tune a design when the net stiffness of the first stage carcass matches the directional stiffness of the second stage components. For example, if the design requires an improved ride quality, the designer might soften the bead apex, lower the ply turn ups, and thin the sidewall gauges in order to allow the tire's carcass to flex suitably with each large road input.

By comparison the second stage components might include a higher belt angle and an increase in tread base gauge. This would allow the tire to crown in the center line, concentrating the contact area to the center of the tire to reduce road contact inputs across the face of the tread/belt package. The tread base typically has a high percentage of natural rubber content and at a lower hardness than the tread cap provides a cushion between the tread cap and the belts, further reducing transmission of road inputs. This technique of "balancing the tire stiffness" creates a baseline of performance by which the designer can then focus on specific performance changes from further tuning changes in the components, compounds, or gauges of future experimental tire specifications within a specific tire development program.

By the time that the developmental tire mold has arrived, the tire designer should have discussed with the factory process engineers the dimensions of the initial extrusion dies for the tread, sidewall, and bead apex. For the tread, the block width (area of tread to contact the road surface shoulder to shoulder) of the mold should closely match the block width of the extrusion, the split between tread cap and tread base should be informed, and if possible an initial extrusion trial should have been conducted in order to check the stability of the tread compounds (growth and swell out of the die). Meanwhile the chemical laboratory should have taken samples of the tread compounds, if using an experimental formulation, and analyzed the samples by Rheometric analysis, and dynamic strain or temperature sweeps to understand whether the initial batch is expected to deliver the proper performance, whether the rubber batch is thoroughly mixed at the Banbury, and some idea of the scorch temperatures for the new compound.

Much of this work happens simultaneously so that the tire designer may or may not be informed of every detail, but depends upon the factory process engineer to order the extrusion dies to meet his tire build schedule. Also, for those tire designs which are new sizes for a factory, the factory process engineer might coordinate the ordering of new tire building drums, linkages for the bead winder, and new curing bladders for the incoming mold. The materials members might be coordinating the arrival of new components such as silica, coupling agents, unique polymers, etc. if not already in use.

According to the size and type of tire, the tire designer might next consider the type and amount of bead wires used. After selecting the wire to be utilized, the designer should consider the stacking arrangement for the bundle.

If the facility only has taped bead constructions available, the decision becomes how many turns and strands the bead will have. All turns will contain an equal number of strands.

For those facilities which utilize hexagonal or polygonal shapes and single wound wrapping of bead wires, each row of bead wires can be somewhat unique from the layer above or below. Bead burst testing has indicated that the strongest band in any tire's bead should be the lowest strand. Therefore, consideration should be given to establishing an adequate base count and determining the best bundle type from that point.

One consideration in finalizing the bead bundle shape and wire count is the bead apex base width. The uppermost row of bead wires should make it possible to rest the base of the bead apex upon it.

Some of the functions of the bead apex are to generate lower sidewall stiffness centrally in the tire (over the bead). Stiffness outside of this, by sidewall compound alone, for example, doesn't generate the same level of handling precision as that directly over the bead bundle, since the bead bundle is the direct contact to the rim which assists in the transfer of steering inputs by the driver. Another function of the bead apex is to separate the carcass ply and its turn up. This in effect generates a higher degree of carcass tension, which aids in handling maneuvers and also relates to the tire's ability to support the belt and tread package. A third function of the bead apex is to damp vibration inputs before transmission from the road to the rim and into the vehicle's

suspension system, floor-pan, and steering column. Once the bead bundle and the bead apex are selected, ply type and gauge, number of plies, and turn up heights are determined.

In developing a tire for an OEM, soon the tire designer begins to learn the performance preferences of the vehicle engineers he/she is working with. This knowledge comes to bear especially when determining the side stiffness of the tire (bead apex, ply turn up heights and cord type, and sidewall compound selection) along with the matching wire density, belt angle, and tread compound formulations. This being the case, several different tire sizes for different vehicle fitments of one vehicle maker could have relatively similar tire constructions.

OEM considerations aside, the tire designer's task is somewhat more straight-forward when designing for the aftermarket. When establishing designs for sale in tire retail outlets, the designer is tasked with proliferating a range of tires having basically the same features (allowing for size to size deviation in actual performance). As an example, 25 to 30 sizes might be included in the range under one line name. Once the number of sizes is selected, typically by marketing input, several of the sizes might be selected due to the expectation of sales volume they will generate and these might be determined to be the key sizes to receive the largest battery of tests. Other sizes for which marketing has predicted lower volume might not be specifically evaluated in benchmarking comparisons with competition or costly endurance testing until much nearer the time of product launch for the whole line of tires to the market. This isn't to say that the approach mentioned above is the universally accepted methodology for releasing a range of products, but it is one method employed from time to time in the tire industry.

I mentioned the designer's task in designing an aftermarket tire is more straight-forward because it is often the case that tire designers establishing a new line of tires will generate, in one form or another, a matrix for the entire line in which the designs for the key sizes are established based upon competitive analysis and perhaps incumbent products with which the designer is familiar. Once the key tire size designs are determined, the designs of the additional sizes are filled into the matrix by factorization; meaning, the component dimensions are factored up or down from the key sizes (or max and min sizes) based upon the dimensional relation of the specific tire sizes themselves.

In this way mold and design drawings can be rationalized (minimized) by overlaying several desired profiles onto one drawing, or utilizing one stamping drawing to demonstrate the placement and text on the sidewall for virtually the whole line of products. This is sometimes termed "embedding" designs.

Whichever approach is administered in the design of the tire, the tire designer still maintains the responsibility to ensure the tire meets all testing standards for durability, safety, and regulatory requirement before release to production. The initial production tires should be monitored and retested to confirm previous performance levels are maintained after mass production commences.

The next step in determining the initial design of a tire might be to decide on the belt materials and settings. Here again, the belt material is one of those components which can represent a "bottleneck" for a manufacturing site if multiple wire types are introduced. Multiple wire types

in the manufacturing environment create complexity in the management of various wire types through creeling (stringing multiple spools of belt wires), calendering (applying belt skim to the creeled wires), belt roll storage, and cutting operations.

Design decisions regarding steel belt specifications could include:

- Belt angle orientation. For markets driving on the right-hand side of the road a standard has been established for which angles should be nearest the tread pattern. Apply these incorrectly and the tire may have a strong tendency to drift sharply off the road to the right-hand shoulder. Applied correctly, the tire should have some corrective tendency to either maintain a straight track or drift slightly against the grade of the road, even when the road has 1 to 3% cant angle. The reverse is true for markets in which vehicles are driven on the left-hand side of the road.

- Belt width should create an appropriate belt to belt step off. Too little difference in the widths of the 1st and 2nd belts and the potential for coincidental endings which generate higher heat on the belt edges due to the flexion occurring near the uncoated ends of the cut belts exists. Too large a difference in belt widths and the endurance of the tire is compromised when the 2nd belt does not cover the full tread width in contact with the road, creating higher loading on the point where the 2nd belt hinges to the 1st belt.

- Belt angle affects the final cured tread radius. The higher the angle the more "crowning" which will occur in the inflated tire. This is a result typically sought for tires meant to exhibit more ride comfort qualities than handling precision. Noise and rolling resistance are also improved in this manner as the shoulder drag is reduced when the center has more contact, and with the shoulder pressure reduced there are several frequencies of noise which are reduced in the road noise, belt edge resonance, and pattern noise frequency ranges (between 125 and 2000Hz).

- Typically belt skim and belt skim gauge for manufacturers who do not utilize unbalanced belts are standardized for a particular tire type. Therefore this element would not usually be decided by the tire designer. Again, the chemists and service compounders would be required to certify that the proper anti-degradants (anti-ozonants and anti-oxidants) were included in the belt skim mix in appropriate content to handle the heat and flexion encountered throughout the lifecycle of the tire. Also, these or additional anti-degradants are required to handle the potential for chemical aging and exposure to climactic elements during the lifecycle of a tire.

- Also, typically the belt cushion (whether designed as the upper taper of the sidewall extrusion or as an individually extruded wedge of rubber) is predefined by those involved in studying the green tire components based on the belt widths and overall tire height dimension provided by the tire designer. The gauge and width dimension of the belt cushion would be fairly consistent from tire to tire.

- Belt wedge or belt edge gumstrip is also rarely modified either in chemical composition or dimension.

Next, the designer must determine whether the tire should have a nylon band component over the belts due to usage, speed rating, load rating, DOT plunger test, or specific customer requirements for handling or noise control.

The nylon used in tire designs has excellent thermal-set properties to allow it to shrink with heating and apply additional resistance to a steel belt system, which ultimately tends toward lifting from the fabric-based carcass beneath it, due to differences in rigidity, steel spring memory, centrifugal forces, mechanical forces generating strain and stresses including compression and tension at various points around the tire and during each loaded revolution of the tire's use.

Before the advent of wound nylon strips, called spiral nylon over wrap or bands by some manufacturers, the inclusion of a full belt width of nylon created some challenges for tires. These included morning flatspotting for the first several miles of driving each day and the possibility for the splice to pull apart during the growth encountered when the tire was cured. This required the splice to be overlapped overly wide to ensure good final splice coverage.

With nylon strips, the heavy overlap is virtually removed. The result is the same qualities of nylon to sustain the belts, increased high speed performance, increased plunger strength, isolated road noises, increased handling response, and better management of heat under higher loads-- while eliminating the periodic thumping of a heavy nylon splice—though flatspotting can still be an issue.

In the absence of a more economical and technically-capable belt bandage, nylon is certainly appropriate for a multitude of design considerations. Nylon hybrids and Kevlars are certainly available; but with limited use and adoption, it is not likely in the near term that these will compare to nylon on a cost per linear foot basis. I've expressed several applications for nylon, yet some manufacturers continue to refuse to adopt nylon due to the cost impact--though I know of no material substitute for it which even comes close to its cost, while providing a safer, alternative design.

I have explained some performances about which the tire designer must be aware during the development cycle for a new tire. I have discussed at some length the individual components and the decision process around some of them regarding selection to meet certain test criteria. In doing so, I believe I have mentioned several components which are nearly universally used in tires of a specific category, be it passenger and light truck or others. These might include innerliners, bead wire and skim, ply cord types, ply skim stocks, chafer fabric and skim stocks, belt wire, belt cushion, belt wedges, belt skim stocks, undertread compounds, tread base compounds, rim protector compounds, nylon cap ply fabric and nylon skim stocks.

The processing aids for any of these rubber components are oils, tackifiers, peptizers, plasticizers, and softeners. The curatives are accelerators, activators, and sulfur. The adhesion promoters are coupling agents, cobalt salts, brass on wires, and resins on fabrics. The anti-degradants are antioxidants, antiozonants, and paraffin waxes. The reinforcing materials are carbon black, silica, and resins.

It is vitally important to realize that when a specific tire product begins to show unacceptable performance, one common link to other products is the use of the universal components within a single factory or set of factories. This overview can help those investigating to isolate root cause effects from others, and hone in on the major factors involved.

Another link shared with the suspect tire is the historical performance of chemical ingredients such as the processing aids, curatives, adhesion promoters, anti-degradants, and reinforcing materials being used by a particular tire manufacturer or a specific factory. The way in which those specific ingredients are handled within the factory, the methods used to load them into the Banbury mixing process, the time given for the proper milling of the rubber stocks, the efforts taken to protect the prepared component from environmental contamination, blooming, or aging- all of these considerations may not be entirely evident from a single tire, yet by understanding the overall methodology involved at the manufacturing site, the tire designer, field service manager, or forensics analyst can better identify all the contributing factors surrounding the lack of performance, whether that is a product integrity issue or achieving a certain level of new tire performance.

It has been my experience that the category of passenger tires has transitioned from 13" and 14" tires in the late 1980s to now extend well into the 20" diameter range. The fitments for passenger tires have been extended to pickups and SUV's by the major OEM's of the world. Further the vehicle categories themselves have blurred from the standard categories offered in the 1980s, from sedans to sedan-type multi-use vehicles, from pickup trucks to six-passenger SUV's with payloads of three quarters of a ton.

Just as this transition has occurred in vehicle categories, some of the distinctions for the tire types being used have also been blurred creating similarities between (P-metric) passenger and (LT) light truck tire designs. The exceptions are typically in tread pattern depth and type. With the increase in passenger tire overall diameters, the tire building and curing machinery is basically identical between the two segments these days. The tire building personnel (tire builders and curing room operators) may build either type of tire interchangeably. The training they have had in either type of tire production being adequate for the other.

Having given thought and consideration to each of the design steps previously mentioned, the tire designer awaits the arrival of the mold, then initiates the first specification upon its delivery. Once the tire specification is produced, the tires might be footprinted for contact shape, sectioned for gauge and component placement confirmation, and evaluated for uniformity. If each of these are deemed to meet the specification, the tire might enter a more thorough testing battery. Otherwise, the process is restarted with perhaps three to five additional variants included in the new specification requests, until an acceptable specification is realized.

## TIRE FORENSIC ANALYSIS METHOD

I examine tires that have been involved in tread separation accidents in a specific manner, which is the same manner used by other tire experts, both plaintiff and defense. I have confirmed this by meeting and discussing this topic with other tire experts. It is also the same manner that I used while working in the tire industry for Goodyear-Dunlop.

The objective is to try to determine the cause(s) of the tire failure. The examination starts with a visual examination of the outside of the tire, including sidewalls and beads, carcass, and tread. Tire markings and codes are noted. Any cuts, bruises, or other damage is noted. The tread and steel belts are inspected. Measurements are made of locations of markings and abnormalities. Then the inside of the tire is inspected visually. Close attention is given to any punctures, innerliner problems, including gauge, splices, cuts, or other abnormalities. At the same time, a tactile inspection is made. All surfaces, both exterior and interior, are felt for abnormalities.

Various devices are used in the tire examination, including spreaders, high intensity lights, magnifying devices, laser non-contacting devices, and microscopes. X-rays are done if appropriate. Shearography use is considered and ordered if appropriate. The companion tires at the time of the accident are examined if available. The subject wheel is closely inspected, as are the companion wheels, if available. Then I take photographs of the condition of the subject tire to document and show its condition. Also, as important as the positive findings on the tire, is the absence of signs on the tire. Most user-caused conditions will leave tell-tale signs on the tire. Their absence is strong evidence that the tire was not significantly, adversely affected by improper use or maintenance. This is the method that I used in the examination of the subject tire.

I also employ the scientific method in conjunction with my tire examination, experience, education, training, and scientific and technical literature, studies, and testing, as applicable, to reach my tire failure analysis and defect opinions in this report.

<u>HISTORY</u>

When I was retained to examine the tire which is the subject of this report, I inspected the subject tire, 2 tread pieces, and the subject rim. Subsequently, I was provided with the following additional materials for my review and reference in this matter:

- Accident Report

INCIDENT:

According to the accident report provided in this matter, on June 16, 2004 at 3:30pm —a 2000 Ford SUV driven by Angel Juarez Moreno suffered a tire separation, loss of control, and rollover while traveling northbound on route toward Flores Magon, Chihuahua Junction, Mexico.

FINDINGS:

**Tire: LT265/75R16 123/120Q FIRESTONE STEELTEX RADIAL A/T**
**DOT: 8XW8 1XL 2601 (AIKEN, S.C.)**
**Construction:** 2 ply polyester + 2 steel
**Max. Inflation:** 80 PSI
**Max Load:** (3415 lbs)
**Tire Position:** LR
E4--008062

Evidence was available for inspection as follows:

- The subject tire with a full tread/#2belt separation.
- Two tread pieces.
- Subject rim.

The tire was marked in the following manner to help with the orientation of my observations:

The DOT (found on the serial side of the tire's sidewall, called SS in my report) was considered the starting point or 0 degrees. Rotating clockwise around the sidewall, my inspection notes were taken in increments of 30 degrees. The opposite side of the tire was evaluated in the same way; however, rotating counterclockwise in order to be consistent side to side. The tread and carcass were also measured in increments of 30 degrees starting above the DOT.

(SIDEWALL SS-SIDE)-(bsw)

- Rim groove (4.8 x 0.4)

- Cracking at S-diameter.

- No splits this sidewall.

- At 65 degrees, clip impression.

- From 45 to 90 degrees, approximately 145mm bead toe tear exposing ply cords.

- At 295 degrees, clip impression.

- At 320 degrees, clip impression.

(SIDEWALL SOS-SIDE)-OWL

- Rim groove (5.3x 0.5)

- From 0 to 45 degrees, bead toe/ledge tear.

- At 10 degrees, upper sidewall abrasion into WSW through coverall.

- At 265 degrees, abrasion in mid-sidewall.

- At 275 degrees, clip impression.

- At 315 degrees, clip impression.

- From 315 to 45 degrees, bead toe/ledge tear.

(INSIDE TIRE)

- At 5 degrees, heavy ply splice ~ 8 cord overlap.

- At 55 degrees SS-side, rip in innerliner.

- At 80 degrees SOS-side, patch repair.  Appears well sealed.

- At 100 degrees, wide innerliner splice on slight angle.

- Cord shadows throughout.

- At 350 degrees on SOS-side, 2 rips in innerliner.

(CARCASS)

- Some tread flap remains on either shoulder on the carcass.  The majority on SS-side.

- At 0 degrees on SS-side, trapped air channel at shoulder.  At SOS-side, raised #1 belt wire overlap.  Three strips of #1 belt stripped in belt, not broken. Lifted from carcass.

- At 15 degrees on SS-side, rubber reversion zone, beach marks, and reversion continuing beyond the crescent zone.

  o  C/L-2 broken #1 wire filaments.

  o  SOS-missing #1 belt cable.

    ▪  Raised #1 belt cable with irregular wire spacing.

- From 0 to15 on SOS-side, rubber reversion.

- From 0 to 60 degrees on SOS-side, ~ 13 undulations.

- At 30 degrees on C/L, broken #1 belt filaments and loose cable.

  o  SOS-side, broken #1 belt filament and loose cable.

  o  Gapped, irregular wire spacing.

  o  Reversion and polishing along shoulder.

- At 35 degrees on C/L, lifted #1 belt filament.

- At 45 degrees on SS-side, gapped and overlapped #1 belt splice.

  o  Peak in rubber reversion crescent zone ~ 60mm.

- From 45 to 105 degrees on SOS-side, major rubber reversion crescent zone.

- From 45 to 120 degrees on SOS-side, approximately 12 tread pitches available on tread flap.

- At 55 degrees C/L, approximately 6 broken wire filaments.

- At 60 degrees SS to C/L, approximately 5 broken wire filaments.

- At 75 degrees on SS-side, overlapped and gapped #1 belt splice.

- At 100 degrees on C/L, 2 broken #1 wire filaments.

- At 105 degrees on C/L, 1 broken #1 wire filament.

- At 115 degrees on SOS-side, trapped air smoothness on skim.

- At 135 degrees on C/L, spread #1 belt cables.

- From 135 to 165 degrees on SOS-side, cracking in belt skim.

- At 145 degrees on SS to C/L, broken #1 wire filaments.

- From 145 to 175 degrees on SS-side, polishing on belt skim.

- At 175 degrees on SS-side, trapped air smoothness on skim.

- From 225 to 0 degrees on SS-side, heavy trapped air channel and cavity on skim to the #1 belt wires.

- At 270 degrees on SOS-side, spread belt cables.

- At 325 degrees on SS-side, raised and gapped #1 belt splice.

- Belt wire type: 1x7.

- Shoulder undulations "necking" at deep shoulder grooves.

AIR LEAK TEST CONDUCTED:  No leaks, except on SOS-sidewall in the "X" in "Steeltex".

(TREAD)

- 2 tread pieces available.

- Tread piece-A is from 240 to 60 degrees on SS-side.  (285 to 60 degrees on SOS-side).

Tread Piece A:

- SOS-full belt edge lifted from tread.

- At 60 degrees, approximately 11 strands of #2 belt wire.

  - On SS-side, main groove impression from tread ~4.1mm high under tread (this is higher than the adjacent groove).

- Tread poorly bonded to #2 belt skim.

- At 45 degrees on SS-side, stray belt wire embedded.

  - Impression of #1 belt splice.

- From 30 degrees to end of tread piece, trapped air channels on SS belt edge and

  inboard from ~ 85mm of the SS belt edge.

- From 60 to 315 degrees on SOS-side, rubber reversion on skim.

- From 30 degrees to end of tread piece on SS-side, 12 to 13 #2 belt strips.

- At 315 degrees, adhesion-arrest mark and fretted SOS wire ends.

- Light liner pattern marks beneath tread on skim.

Tread Piece 2:

- One end  with ~ 11 strips of #2 belt wire fretted at ends.

- Reversion on belt skim at belt edges.

- Trapped air disturbance to wire impressions.

- Raised #2 belt splice.

- ~5 adhesion-arrest marks.

- ~11 strips on opposite end of #2 belts.

- #2 belt width ~ 190mm.

- Tread block width ~ 205mm.

(SUBJECT RIM)

- 16x7 Ford alloy 8 bolt holes.

- No outboard markings.

- "2091" next to valve stem.

- Inboard 16x7K DOT-T Ford 2 040400 F81A-1007-LB

DE SANTIAGO, C.
1586-000498

21

- X1587J

- Valve core installed, no valve cap.

- 2 oz. clip weight outboard.

- Rim flange damage (bent ~ 84mm long).

- No inboard clip weights.

- No damage noted imboard.

- Only rim flange damage noted outboard.

(SUBJECT TIRE XRAYS)

Film 0 degrees:

- Irregular belt spacing.

- ~ 3 broken wire filaments.

- Dog-eared splice in #1 belt with wire contact.

Film 30 degrees:

- Scalloping on belt edge.

- Abraded wire filaments.

- Irregular spacing.

Film 60 degrees:

- Scalloping belt edges.

- Wide, gapped belt splice.

- Abraded wire filaments in contact area.

- Irregular wire spacing.

Film 90 degrees:

- Spread cables.

DE SANTIAGO, C.
1586-000499

22

- Wide, gapped splice.

- Broken wire filament.

Film 120 degrees:

- Irregular wire spacing.

- Abraded wire filaments.

Film 150 degrees:

- Irregular wire spacing.

- Scalloping at belt edge.

- Wire to wire contact.

Film 180 degrees:

- Gapped splices with wire to wire contact along the splice.

- Irregular wire spacing.

- Kinked belt cables.

Film 210 degrees:

- Scalloping belt edges.

- Irregular wire spacing.

- Lifted belt filament.

Film 240 degrees:

- Scalloping belt edges.

- Irregular wire spacing.

- Wire contact in kinked belt area.

Film 270 degrees:

- Scalloping belt edges.

DE SANTIAGO, C.
1586-000500

23

- Irregular wire spacing.

- Wire to wire contact.

- Spread wire cables.

Film 300 degrees:

- Irregular wire spacing.

- Lifted belt filament.

- Scalloping on belt edges.

Film 330 degrees:

- Wire to wire contact at splices.

- Spread cables.

- Irregular wire spacing.

- Kinked belts.

Film Tread 30 to 60 degrees:

- SOS belt ends are frayed and curled.

- #2 belt strips are lifted from tread.

- Wire spacing is irregular.

Film Tread 240 to 270 degrees:

- SS side wire ends are lifted, curled, frayed.

- Irregular wire spacing.

- Spreading of #2 belt wires at main grooves.

Film Tread 270 to 300 degrees:

- Both #2 belt edges show lifted wires, curled, and frayed.

- Wire on wire contact.

**DE SANTIAGO, C.**
1586-000501

24

- Irregular wire spacing.

- Gaps in belt placement.

Film Tread 330 to 0 degrees:

- Both #2 belt edges are frayed, lifted, and curled.  More severe conditions on SS side.

- Irregular wire spacing.

- Spread belt wires over main grooves.

Film 2nd tread piece:

- Irregular wire spacing.

- Heavy fraying of the belt wire cable ends.

- Belt ends are all stripped.

- Gapped wire splice.

- Wire to wire contact.

- Spread cables.

- Wire overlap.

DE SANTIAGO, C.
1586-000502

ANALYSIS

Upon the examination of the subject tire, I made the following observations which indicate to me evidence of defects in the manufacture and/or design of the tire, or which in my opinion *are* defects. Those observations are as follows:

1. <u>Inadequate bonding of the belt skim</u> is evidenced by poorly bonded rubber skim material between the steel belts. This poor bonding was observed in two modes:

   * Trapped air impressions present on the belt skim material. Trapped air is air that is captured within the tire at the time of manufacture and is itself a separation manufactured within the material of the tire. Bonding of laminated materials cannot exist properly in areas separated by trapped air.

   * Liner pattern marks present on the belt skim material. These marks occur as the liner rolls, usually a vinyl material, used to transport the green tire materials within the tire manufacturing area are imprinted onto the uncured tire rubber stock. When green tire stock sits in the liner roll for a long enough duration, it both takes on the surface impressions of the liner and begins to dry out. When a tire fails in belt to belt separation mode and impressions such as liner pattern marks are observable on the separated surfaces, it is clear that the surface being observed is an original interface of the coated belt components. When these are observed in the tire post-cure, it is strong physical and observable evidence that a proper bond did not occur. . The tire industry's long-standing position on tire endurance has been that the tire is good for usage as long as adequate tread depth remained. Inclusion of defects such as poor adhesion is not noticeable outwardly to the consumer via tire inspection, since these components are covered by the tire's tread, yet often results in premature tire failure.

   It is widely accepted in the tire industry, and is certainly consistent with the training and understanding I received while working in the tire industry, that the ultimate goal in curing a laminated construction such as a pneumatic steel belted radial tire is to achieve the proper degree of chemical bonding by inducing heat and pressure over the appropriate period of time to allow the curatives in the rubber to activate and produce the result of a durable, unified rubber product. The tire becomes a working "system" derived from all the individual component parts as these are melded together in the molding process. Understanding the intent of properly designing, manufacturing, and curing the tire, it is clear that the subject tire suffered from the manufacturing defect of improper bonding between the coated steel belts.

2. The presence of rubber reversion zones on the belt skims from <u>oxidative degradation</u> indicates that it was not capable of managing the heat, stress, strain, flexion, and oxygen exposure being generated between the steel belts of the subject tire. These conditions are

normal and calculable considerations for the designer at the time the tire is designed and manufactured. Mr. N. Tokita's paper on the effects of oxygen migration and attack on belt skims during loaded cycling of a tire relates the expected outcome of antioxidant depletion in these rubber types. These may be represented as both design and manufactured defects in the subject tire. [See Appendix item "Long Term Durability of Tires" in which N. Tokita describes the influence of oxidation on the rubber belt skim component of the steel belt package.] Belt skim rubber is enriched with antioxidants. The function of those antioxidants is to chemically link to any oxygen attacking the rubber. This function maintains the original properties of the rubber until the antioxidants are depleted. At the point of antioxidant depletion, the rubber is affected in several ways including cracking, polishing, and reversion (a loss of elasticity). With a loss in elasticity, the belt skim cannot flex with the steel belts as they rotate into contact with the road, ultimately separating the belt wires from the rubber. N. Tokita cautions that care must be taken in the proper selection of rubber formulas for the critical steel belt rubber skim component. A lack of adequate antioxidant remaining in the skim stock and/or in the original compounding of the skim stock rubber to allow a tire manufactured in 2001 to operate properly in 2004 contributed to the oxidative degradation of the tire.

3. The absence of nylon reinforcement in this tire, which was a known and proven tire component at the time of the manufacture of the subject tire, is a design oversight in the absence of other countermeasures to belt separation and represents a design defect. The application of nylon provides enormous benefits to the steel belted radial tire in various areas of performance including: plunger strength in rough terrain, improved durability in standard operation, high speed performance, a barrier to migration, and due to its placement over the steel belts provides an improved restriction to movement within the underlying belts. Nylon banding reinforces the belt edges under load and resists centrifugal belt end lifting. It also helps to dissipate the load in the higher strain regions and protect the belts from movement against each other under those loads. While nylon cap plies may not be required to ensure durability in a properly manufactured and designed tire, it is clear that the subject tire would have benefited by the use of a nylon cap ply.

By and large, certain of these manufactured defects would not be easily detectable by the consumer until a catastrophic failure ensued. Nylon cap plies are a design element that is known to both decrease the risk and increase the utility of steel belted radial tires. Nylon continues to represent a technology and material which was readily available, feasible, and known by BFS. Given the other itemized weaknesses, the lack of nylon cap plies in this tire is a design defect. [See Appendix items Uniroyal, Goodyear, and Sumitomo patents describing the contribution of nylon cap plies in steel belted radial tires for reinforcement of the tread/belt package, aiding in improved durability, improved high speed performance, pre-tensioning of the steel belts during the curing process, and as a restriction to belt edge separation.] Additionally, recent marketing brochures from Michelin's BFGoodrich Long Trail T/A and Rugged Trail T/A tire lines indicate that nylon has been applied in these tires' designs to provide "equal tensioning". This pre-tensioning of the nylon occurs in the following way:

DE SANTIAGO, C.
1586-000504

27

- During the tire building stage, the uncured tire is manufactured to be smaller than the mold it will be cured inside. This is to allow installation of the green tire into the mold without scraping the tread detail inside the mold.

- After the steel belts are applied, nylon cap plies or strips are applied. Then the tread is placed on the tire and the whole assembly is stitched together under pressure.

- When the green tire is installed into the mold, heat and steam pressure are applied to the green tire. Once the tire begins to heat it is made more compliant and is held at high enough pressure that it grows into the mold at a percentage change to the overall diameter of between 1 and 5% growth. During this growth, the nylon's influence to restrict the "belt stretch" intensifies its restriction on the belts to move. This restriction is the "pre-tensioning" mentioned in the BFGoodrich brochures and U.S. Patents.

4. The subject tire exhibits belt irregularities. The belts show evidence of scalloping and undulations along the belt edges, irregular wire spacing, belt wire overlaps, heavy gaps, dog-eared splicing, spread cables and wire to wire contact. The impact of this irregularity in spacing is that these contribute to heat generation and increase in stresses and strains along and surrounding these points of poor splicing. This lack of process control is a manufacturing defect. The belt spacing should be controlled through a properly-spaced comb set at the calender. These belts exhibit multiple cable overlaps at several of the splices. It is common in the tire industry to have as a standard for the splicing of steel belts--a "butt splice" which means that no cords should overlap at all and no large gaps should be allowed. The presence of overlapped cables in the splices produce the undesired effects of reducing the belt skim along the raised wires from shoulder to shoulder and placing those wires closer to the belt wires in the adjoining belt. During the tire curing process the skim is thinned in these areas.

During the time I worked in the tire industry I learned that the placement and treatment of the steel belt "package" of a steel belted tire was critical. I observed that laser lights were installed to assist with the precision of the placement of the steel belts. I was aware of X-ray machines in operation at the manufacturing facility for the regular auditing of finished tires, specifically to confirm the placement and condition of the steel belts within the cured tires, since the X-ray only identified the steel components of the tire. I recognized the emphasis through staffing, equipment, and expenditures placed on the necessity for proper manufacturing of the tires. The above mentioned belt irregularities represent manufacturing defects in the subject tire.

5. As noted in my inspection notes above, I saw evidence of cord shadowing in the subject tire. In many instances, this physical observation is indicative of a manufacturing defect in the subject tire that resulted in a thin innerliner. A thin innerliner is typically more permeable to air and hence may result in accelerated oxidative aging of the tire. Once additional information is obtained about the subject tire's green and cured tire specifications, BFS's internal policies and procedures, testing and research of the innerliner and the tire's specification change history, I may be able to specify more directly whether the cord shadowing itself is more likely than not an issue of manufacturing or design defect.

DE SANTIAGO, C.
1586-000505

28

I have noted the breakdown in the bonds between the ply carcass skim and the underlying #1 belt skim in the subject tire. This condition is demonstrative of the oxidative degradation as permeation occurred from the inside of the tire toward the outside under the higher inflation this tire was intended to maintain (i.e. 80 PSI), affecting the bonds underlying the steel belts as well.

As part of my standard methodology and the accepted methodology in the tire industry, I also evaluated other potential or alternative causes for the tire failure other than the manufacturing or designed defects described above. I considered the following:

- Whether there may have been an impact that may have caused this failure. I observed:

   - I observed no sidewall splits to either sidewall of the subject tire.
   - No breaks in the #1 belt, and only lifting at various points.

Given my observations, it is my opinion that impact played no role in the belt to belt separation of this tire, eliminating impact as a causal factor in the failure of this tire.

- Whether under-inflation, over-inflation, or over-loading caused this failure. I observed:

   - Rim grooving in the bead flange area, although in my experience it has been my observation that even under completely known conditions of load and inflation pressure, tires mounted on rims and subjected to load and inflation and driven typically produce some degree of rim impression. The rim grooves in the subject tire were dimensionally consistent with that of many other tires that can be observed in service, as well as tires I have tested.

Given my observations, it is my opinion that under-inflation or over-deflected operation cannot be causally linked to the failure of the subject tire.

Noted in my observations was the presence of a repair patch on the inside of the tire. This repair was inspected and tested for air seepage. No seepage was noted through or around the patched region. In my opinion the repair patch did not contribute to the premature tire failure in this matter.

DE SANTIAGO, C.
1586-000506

29

## SUMMARY OF OPINIONS

It is my opinion that the tire failure in this matter was caused by manufacturing and/or design defects in the subject tire which led to a chain of events ending in the catastrophic injury in this matter. In a tire failure such as the one in this case, there are sequences of events associated with the eventual tire de-tread. Some of those involve internal influences which combine to result in the eventual de-tread.

In distinguishing the types of defects which occur, they are usually segregated into manufactured and design defects; however, some are a combination of improper designs and improper manufacturing techniques introduced into the tire. The following summarizes my opinions as to the nature of the tire failure in this case and the manufacturing and/or design defects contributory to the failure and resulting injuries.

This tire experienced catastrophic failure stemming from insufficient adhesion between the rubber skim interfaces of the steel belts. The tire had insufficient belt to belt adhesion. Without proper bonding between the rubber skim and steel, a separation was initiated which propagated from the belt endings, lifting the tread and second steel belt from the 1st steel belt.

My examination of the subject tire revealed the following evidence of defective or negligent manufacturing or design of the tire which resulted in accelerated oxidative degradation, poor belt-to-belt adhesion, and this tire failure:

* The tire exhibits belt skim that was incapable of resisting degradation from heat, oxygen, stress, and strain within the tire, as evidenced by the oxidative degradation of the rubber noted on the tire. This constitutes a defect.

* The tire exhibits a lack of proper bonding of the belt skim rubber as identified by the physical, observable evidence of trapped air separations and liner pattern marks within the skim layers themselves. These are manufacturing defects.

* The lack of a nylon cap ply is a design defect in the subject tire given that absent this component a tread separation occurred without evidence of contributing outside influences to the failure of the subject tire.

* The tire exhibits irregularities in the steel belts, namely spread cables, scalloping, necking, open splices, overlapping belt wires, and wire to wire contact other than at splices. These are all stressors within the tire and are manufacturing defects in the subject tire.

* The tire exhibited thin innerliner material observed through ply cord shadows apparent on the innerliner surface. This condition leads to oxidation throughout the tire. This condition is observed between the carcass skim and the 1st steel belt, as well as between the belts themselves. This is a defect in the subject tire.

DE SANTIAGO, C.
1586-000507

30

It is my opinion that the manufacturing and design defects mentioned above caused and contributed to the tire failure of the subject tire in this instance as oxidation began on the steel belts and rubber components. Ultimately, at the point that the rubber to rubber bonds in the belt edge area were sufficiently weakened, the belt wires moved free of the surrounding rubber and that movement propagated along the belt edge circumferentially and cracking through the belt skim migrated across the face of the belts to the point that the upper belt and tread mass was not constrained by proper adhesion any longer and lifting of the tread began until the tread lifted and separation occurred.

With respect to manufacturing and design defects mentioned, there were safer, alternative designs and manufacturing processes and know-how available to Bridgestone Firestone at the time the subject tire was produced. These meet the litmus test of being both economically and technologically feasible and practical for a tire manufacturer. Had these been employed in the manufacture of the subject tire they would have either eliminated or significantly reduced the likelihood for failure in the observed modes.

These safer, alternative design elements include, but are not limited to:

- Application of a nylon cap ply, which was a known and proven tire component at the time of the manufacture of this tire would have produced a benefit in tire durability in the absence of other known and available countermeasures to tread separation failure, in addition to providing a barrier to migrations within the tire under high ambient service conditions.

- Chemical modifications for better degradation resistance in the belt skim formulation.

- Better component consolidation and stitching to eliminate trapped air.

- Better shelf-life quality control of "green" components.

- Better placement of the steel belts.

The inherent weaknesses and defects as described above in this tire are contributory to its failure, and therefore a combination of alternative design measures were warranted to elevate the tire's overall endurance and prevent failure.

The above are my stated opinions regarding this incident tire and the materials and information made available to me at the time of my evaluation. Those materials include the subject tire and rim, the accident report, photographs, my training, and various experiences with tire designs and efforts to improve performances based on analysis of test results and failure analysis, my education, and articles, studies, and publications read. I also rely upon the fact that the subject tire is not a stand-alone incident regarding Firestone Steeltex A/T load range E tire failures. I have inspected other similar cases of tread separations among this size and type of tire.

I have been advised that the Steeltex collection of documents are available for review in this case pursuant to a sharing protective order, but no set has been provided to me yet in this case. I have seen these documents in other cases and plan to review and rely upon them in this case to the extent that they are properly produced for my review.

Additional opinions, observations, and conclusions are stated elsewhere in this report.

I reserve the right to supplement findings and opinions expressed in this report should information be produced through discovery by BFS in this case about Steeltex A/T tires (or sister tires to the Steeltex A/T) and materials or documents related to other similar instances of BFS tire failures.

Depending upon the opinions offered by BFS experts, I reserve the right to rebut any opinions provided on behalf of the defendants. All of my opinions above are to a reasonable degree of engineering and scientific certainty.

# Troy W. Cottles
## Resume

**Forensic Tire Failure Analyst**
**Tire Design and Manufacturing Consultant:**                    (7/2005 – present)

**Education:**

Bachelors of Science, Mathematics/Physics minor, Athens St. University, 1988.
Mechanical Engineering Study, University of AL Huntsville
Additional Training:
3-month design study with Sumitomo Rubber Ind., Ltd. Kobe, Japan
MSOffice Suite; MSProject; AutoCad; Taguchi Techniques (DOE)
Management Skills for Engineers
Design Failure Mode and Effects Analysis (DFMEA)

**Technical Focus:**

My 17 years of experience in the tire and rubber industry culminated with a promotion to the
position of technical director of tire development for Goodyear-Dunlop Tires N.A. Ltd.  I provided
direct technical input into products specific to passenger and light truck OE products from 1997
onward and most recently, OE and aftermarket lines of ATV products (both bias ply and radial
constructions).

**Professional Experience:**

***Goodyear-Dunlop Tires N.A., Ltd. (Buffalo, NY)***
**Technical Director**                                      (6/2005 to 7/2005)
- Responsible for all joint venture development programs (motorcycle, ATV, passenger).
- Responsible for meeting annual financial goals through product development management
  and cost improvements.
- Administration of the annual divisional capital and expenditure budgets.
- Negotiating technical support for outsourcing ATV products.
- Initiated technology thrusts for ATV products, including innovative ply and belt materials.
- Supporting OEM commitments through inter-company prioritization.

- Technical support on product liability issues (review claim tires, provide documentation and
  drawings, interpret technical specifications, and provide background on original design
  requirements).

DE SANTIAGO, C.
1586-000510                                                    33

*Goodyear-Dunlop Tire N.A., Ltd. (Buffalo, NY)*
**Senior Technical Manager**                              **(1/2003 to 6/2005)**
- Responsible for ATV and OEM passenger program activities.
- Product integrity test laboratory.  Testing including: endurance, regulatory, and force/moment measurement.
- Achievement of annual financial goals through product development, cost improvement efforts.
- Guidance/countermeasures for product performance improvements as required per internal, regulatory, or customer standards.

*Goodyear-Dunlop Tire N.A., Ltd. (Akron, OH)*
**Senior Manager-OEM Passenger Development**            **(8/2001 to 1/2003)**
- Integration of the OE passenger technical development team of Dunlop Tire Corp. into Goodyear Tire and Rubber Company's technical headquarters in Akron, OH.
- Responsible for OEM passenger/light truck tire design programs in support of Toyota and Honda per scope of the joint venture.
- Manage an annual departmental budget, including cash flow.
- Departmental staffing, annual performance reviews, and associate training.
- Conduct program kickoff meetings and design reviews with Sumitomo, OEM, and internal management in compliance with TS standards.
- Responsible for profitability of all OEM production programs.
- Formulation of countermeasures for any in-service product concerns.

*Goodyear-Dunlop Tire N.A., Ltd. (Huntsville, AL)*
**Senior Manager-OEM Engineering**                       **(9/1999 to 8/2001)**
- Responsible for OEM passenger/light truck tire design programs for Mercedes, Toyota, Nissan, and Honda.
- Supervision of development engineering, CATIA support staff, Detroit liaison office, and inventory control personnel.
- Manage an annual departmental budget, including cash flow.
- Introduction (by presentation) of new technologies to technical executive management of all OEM customers.
- Departmental staffing, annual performance reviews and associate training.
- Global negotiation with counterparts regarding technical roles for OE business based in Japan, Europe, or North America (semi-annual to quarterly meetings overseas).
- Formulation of countermeasures for any in-service product concerns.

DE SANTIAGO, C.
1586-000511
34

*Dunlop Tire Corporation (Huntsville, AL)*
**Senior Manager-OEM Engineering**                    **(10/1997 to 9/1999)**
* Responsible for OEM passenger/light truck tire design programs for Mercedes, Toyota, Nissan, and Honda.
* Supervision of development engineering, CATIA support staff, Detroit liaison office, and inventory control personnel.
* Manage an annual departmental budget, including cash flow.
* Introduction (by presentation) of new technologies to technical executive management of all OEM customers.
* Departmental staffing, annual performance reviews and associate training.
* Global negotiation with counterparts regarding technical roles for OE business based in Japan, Europe, or North America (semi-annual to quarterly meetings overseas).
* Formulation of countermeasures for any in-service product concerns.

*Dunlop Tire Corporation (Huntsville, AL)*
**OEM Senior Development Engineer**                    **(8/1996 to 10/1997)**
* Responsible for all Dunlop N. American OEM tire development program technical activities.
* Customer interface for technical issues.

*Dunlop Tire Corporation (Los Angeles, CA)*
**Customer Liaison Manager**                    **(11/1994 to 8/1996)**
* Technical and field service representative to Japanese OEM R&D and service organizations.
* Negotiation of field service policies with customer corporate service management groups.
* Inspection of field returns at regional and corporate customer sites.  Determination on legitimacy of claims.
* Organization of field tire surveys, JDPower roundtable conferences, and autoshow surveys.
* Technical representative to FAA (Long Beach) on regulatory requirements for new aircraft tire submissions on Boeing 777 and Lockheed programs for Sumitomo Rubber Industries.

*Dunlop Tire Corporation (Huntsville, AL)*
**OEM Design Engineer**                    **(7/1988 to 11/1994)**
* Program development support to Japanese automotive manufacturers.
* Preparation of CAD tire design drawings, manufacturing specifications, and tire designs.

*Steelcase Inc. (Athens, AL)*
**Production Operator**                    **(1987 to 1988)**
* Manufacturing of office equipment.

*Midsouth Testing, Inc. (Decatur, AL)*
**Waste Water System Operator**                    **(1986 to 1987)**
* Titration of industrial waste water to eliminate metals.
* System repair and maintenance.

*Eaton Corporation (Athens, AL)*
**Engineering Technician**                    **(1984 to 1986)**
* Prototype engineering of electromechanical temperature control switches.
* Process engineering improvements—new raw material certification.
* Product engineering—environmental laboratory and field verification testing.

**DE SANTIAGO, C.**
1586-000512                    35

# Troy Cottles

Tire Design Consultant
Tire Failure Analyst

25884 Katpaugh Lane, Toney, AL 35773
H: 256-423-8338
Cell: 256-777-0562
tcottles@mchsi.com

# Fee Schedule

- **Effective:** Jan. 1, 2008
- **Min. Retainer:** $3000--Required at time of inspection for subject tire. Non-refundable.
- **Standard rate:** $300/hour (Additional inspections, analysis, reports, research, teleconferences, and all other, except as noted).
- **Depositions/court appearances:** $400/hour
- **Travel rate:** $150/hour (door to door)
- **All Expenses**
- **Testing:** By quotation

The following testing capabilities are available:

- **Non-contacting 2D laser profile scanning**

- **Expandable (13" to 20") tire inflation/leak detection**

- **T&RA Rim Tapes**

- **Radial Runout**

- **Tire X-Rays (coordinated locally for most sizes)**

*Payment is due upon receipt of invoice.   After 90 days, an 18% APR late charge will be applied.

DE SANTIAGO, C.
1586-000513

36

PUBLICATIONS/PATENTS

Statement dated 06-July-2006:

I currently have produced no publications or patent submissions.

## DEPOSITION TESTIMONY HISTORY

| Date | Type | Case | Venue |
|------|------|------|-------|
| 3/21/06 | Deposition | Underwood v. Bridgestone | Gwinnett, GA |
| 8/3/06 | Deposition | Loza v. Cooper | Maricopa, AZ |
| 1/30/07 | Deposition | Thorne v. Ford, et al. | Montgomery, AL |
| 2/19/07 | Deposition | Werner v. BSFS | New Mexico |
| 3/9/07 | Deposition | Loza v. MNA | Tucson, AZ |
| 3/30/07 | Deposition | Scifres v. Ford | USDC, OK |
| 4/11/07 | Trial | Thorne v. Ford, et al. | Montgomery, AL |
| 5/30/07 | Deposition | Holmes v. Ford | Atlanta, GA |
| 8/23/07 | Deposition | Cleminson v BFS | S. Carolina |
| 9/17/07 | Deposition | Seville v. Cooper | Florida |
| 9/25/07 | Deposition | H. Johnson v. BFS | Alabama |
| 10/4/07 | Deposition | Guzman v. CTNA, et al. | Texas |
| 11/13/07 | Deposition | Hughes v. MNA, et al. | Atlanta, GA |
| 12/4/07 | Deposition | Tuffly v. Cooper, et al. | Texas |
| 12/14/07 | Deposition | Lujan v. Cooper | New Mexico |
| 1/4/08 | Deposition | Telusme/Pierre v. Cooper | Florida |
| 1/23/08 | Deposition | Whitten/Green v. Isuzu, MNA | Tennessee |
| 2/1/08 | Deposition | Sherwood v. MNA, Ford | Georgia |
| 2/13/08 | Deposition | Joyner v. MNA | S. Carolina |
| 2/26/08 | Deposition | Rodriguez de Garcia v. MNA | Texas |

DE SANTIAGO, C.
1586-000515

38

REFERENCE MATERIALS

The materials used in support of conclusions formed in this preliminary report were from the following sources:

Basic Car Tyre Development Principles, SAE 890103, Giovanni Rimondi, Pirelli Coordinamento Pneumatici

Configuration Of The Brass On Brass-plated Steel Wires in Tire Cords, Ruth Giuffria and Angela Marcelli, Rubber Chemistry and Technology, Vol. 55, 1982

Adhesion of Brass-plated Tire Cord to Rubber, W.J van Ooij, Wire Journal, August 1978

Mechanism And Theories of Rubber Adhesion To Steel Tire Cords---An Overview, W.J. van Ooij, Rubber Chemistry and Technology, Vol. 57, 1983

AES And Factor Analysis Study of Cord-oxidized Brass Layers And Rubber-to-Brass Interface Chemical Composition, G.G. Kurbatov, V.G. Beshenkov, and V.I. Zaporozchenko, Surface And Interface Analysis, Vol. 17, 1991

Alternatives To Brass For Coating Tire Steel Cord, Cipparrone, Pavan, and Orjela, Wire Journal International, Oct. 1998

Degradation Of Adhesion Of Coated Tire Cords To Rubber By Atmospheric Pollutants, Hartz and Adams, Tire Reinforcement and Tire Performance, ASTM STP 694,1979

Compounding For Wire Adhesion, SAE 730498, M.P. Wagner, Chemical Div., PPG Industries, Inc.

Rubber To Metal Bonding, W.J. van Ooij, Rubber World, Nov. 1996

The Microscopy Of Catastrophic Tire Failures, R.W. Smith,Rubber Chemistry and Technology, Vol. 70 No. 2, 1997

Rubber To Brass Bonding Mechanism Studied By Electron Microanalysis Techniques, K. M. Kim, et al, The Firestone Tire and Rubber Company

The Catastrophic Failure of Steel Belted Radial Tires: Hazard Causation and Prevention, Dr. Alan Milner, Sept. 2000

Factors In Tubeless Radial Tire Durability, D.M. Coddington, Rubber & Plastics News, August 16, 1993

Letter by Ronald Smith to Bruce Kaster.  1/25/2000.

Firestone Interoffice Memo on wire cord configuration. 2/15/1978.

Anatomy of a Radial Tire Belt Edge Breakdown, Retreader's Journal, Sept. 1985.

Firestone Service Bulletin on Tubeless Truck Tires, 8/3/1956.

Review of Recent Advances in Bonding Rubber to Steel Tire Cords, Van Ooij, et al.

Corrosion Mechanism of Brass-Coated Steel Cords for Tires, I. Bouche, Sept. 1987

Physical Factors in Cord-to-Rubber Adhesion by a New Tire Cord Adhesion Test, Fielding-Russell, et. al.

More on Steel for Tires, Oswald A. Drica-Minieris, Goodyear Tire&Rubber 1978.

Some Aspects of Brass in Accelerated Adhesion Degradation and Long Term Adhesion of Wire Cord, P.F. Murray, Firestone, 9/16/1975.

Improving Rubber Penetration and Adhesion Elimination of Corrosion, Walter Schiesser, ITEC 1998.

Rubber to Metal Bonding by Silanes, S. Jayaseelan and Van Ooij, J. Adhesion Sci. Technology, Vol 15, No. 8, 2001, University of Cincinnati.

Combining Cobalt and Resorcinolic Bonding Agents in Brass-Rubber Adhesion, G. Hamed and J. Huang, Rubber Div., American Chemical Society, 1990. University of Akron.

U.S. Patent on Vapor Treatment of Metal Tire Cord.  4, 189,332. 2/19.1980 Goodyear Tire and Rubber.

Long Term Durability of Tires, N. Tokita, et al., Uniroyal Research Center.

U.S. Patent on Composite Materials of Steel Cord and Rubber and a Method for Producing The Same, Tsukamoto, Bridgestone, 5/18/1982.

U.S. Patent on Process for Treating a Brass-PlatedSteel Wire, 5,118,267, Starinshak, 6/2/1992, Goodyear Tire and Rubber.

U.S. Patent on Rubber-Reinforcing Steel Wires and Method of Manufacturing The Same, 5,173,341, Shiratori, Tokyo Rope Mfg.

U.S. Patent on Radial Tires and A Belt Structure, 4,635,696, Gasowski, 1/13/1987, Goodyear Tire and Rubber.

U.S. Patent on Tire and Reinforcing Belt, 4,184,530, Mirtain, 1/22/1980, Uniroyal.

U.S. Patent on Pneumatic Tire, 4,407,347, Mirtain, 10/4/1983. Uniroyal.

U.S. Patent on Asymmetrica Pneumatic Vehicle Tire, 3,834,439, Mirtain, 9/10/1974, Uniroyal.

U.S. Patent on Steel Belted Radial Ply Tires With Cap Plies Employing Single Yarn Reinforcing Elements, 4, 284, 117, Poque et al., 8/18/1981, Fed. Rep. of Germany.

U.S. Patent on Belted Pneumatic Tires, 3,831,656, Senger, et al., 8/27/1974, Uniroyal.

U.S. Patent on Breaker Structures of Radial Tires, 3,973,612, Mezzanotte, 8/10/1976, Pirelli.

U.S. Patent on Tire Casing with Reinforced Sidewalls, 3, 386,487, Massoubre, 6/4/1968, Michelin.

U.S. Patent on Pneumatic Vehicle Tire, 4,724,881, Poque et al., 2/16/1988, Uniroyal.

U.S. Patent on Pneumatic Tire, 4,062,393, Bertrand, 12/13/1977. Uniroyal.

U.S. Patent on Steel Belted Radial Ply Tires With 0 degree Textile Cap Hand, 3, 850,219, Snyder, 11/26/1974. Uniroyal.

U.S. Patent on Belted Pneumatic Tires, 3,786,851, Mirtain et al., 1/22/1974, Uniroyal.

U.S. Patent on Tire Having a Tread Reinforcement, 4,184,529, Boileau, 1/22/1980, Michelin.

U.S. Patent on Reinforcement Belt for a Pneumatic Tire, 4,258,774, Mirtain, 3/31/1981, Uniroyal.

U.S. Patent on Steel Belted Radial Ply Tires with Cap Plies Employing Single Yarn Reinforcing Elements, 4,284,117, Poque, 8/18/1981, Rep. of Germany.

U.S. Patent on Radial Tire Having Interposed Plies at Tread Reinforcement Edges, 3,717,190, Boileau, 2/20/1973, Michelin.

U.S. Patent on Pneumatic Radial Tire, 4,934,430, Koseki, 6/19/1990, Bridgestone.

U.S. Patent on Reinforcing Plies for Tires, 4,791,973, Davisson, 12/20/1988, Goodyear Tire and Rubber.

The Aging of Tires and Similar Objects in Open Air Storage, E. Tuval, A. Thurrn, Z.Rigbi, Tel-Aviv. Israel. Vol. 19, 1999.

Expiration Dates Sought For Tires, Timothy Aeppel, The Wall Street Journal (Safety Research) 9/22/2003.

What NHTSA Applied Research Has Learned From Industry About Tire Aging, James MacIsaac, 7/31/2003.
Tires: Aging Dangerously, Sean Kane.

DE SANTIAGO, C.
1586-000518

41

The Effect of Tire Aging on Force and Moment Properties of Radial Tires. Pottinger, SAE, 2/23/1981, B.F. Goodrich.

Aging of Tire Parts During Service, Asahiro Ahagon, Kida, Kaidou, Rubber Div., American Chemical Society, 5/29/1990, Yokohama Rubber Co.

Long-Term Durability Endurance Certification Test, presented by June Satterfield to NHTSA on 5/24/2001, Michelin North America.

Continental Tire Product Service Information Bulletin PSIB 06-02 "Tire Maximum Service Life for Passenger Car and Light Truck Tires" 2/13/06.

Michelin Technical Bulletin PM-06-02 "Service Life of Passenger Car and Light Truck Tires Including Spare Tires".

Innerliner and Tire Durability by D. Tracey, Walter Waddell-Exxonmobile at ITEC 9/2004.

Impact of Inflation Pressure Retention on Tire Aging and Durability by W. Waddell to NHTSA 3/21/06.

Halobutyl Innerliners Offer Best Tire Durability by D. Tracey, W. Waddell in Rubber & Plastics News, 5/30/05.

DE SANTIAGO, C.
1586-000519

# APPENDIX

## Nylon Cap Plies (Reinforcement):

- U.S. Patent 4,407,347 Oct. 4, 1983 (Uniroyal)
- U.S. Patent 4,284,117 Aug. 18, 1981 (Uniroyal)
- U.S. Patent 4,724,881 Feb. 16, 1988 (Uniroyal)
- U.S. Patent 3,850,219 Nov. 26, 1974 (Uniroyal)
- U.S. Patent 4,934,430 June 19, 1990 (Sumitomo)
- U.S. Patent 3,831,656 Aug. 27, 1974 (Uniroyal)
- U.S. Patent 4,062,393 Dec. 13, 1977
- U.S. Patent 3,786,851 Jan. 22, 1974
- U.S. Patent 4,791,973 Dec. 20, 1988 (Goodyear)

## Tire Aging:

- "Tire Aging: Nothing Lasts Forever…and Tires Are No Exception" www.tirerack.com.
- "Expiration Dates Sought For Tires" by T. Aeppel, Wall Street Journal.
- "What NHTSA Applied Research Has Learned From Industry About Tire Aging" by J. D. MacIsaac. 7/31/2003.
- "Long Term Durability of Tires" by N. Tokita, Uniroyal.
- "Accelerated Aging II" by John Baldwin (Ford) to the American Chemical Society, 5/17/2004.
- Comments from S. Kane to NHTSA on Docket 02-15400 (Strategic Safety) 9/17/2003.
- "Tires: Aging Dangerously" by S. Kane (Strategic Safety).
- Continental Tire Product Service Information Bulletin PSIB 06-02 "Tire Maximum Service Life for Passenger Car and Light Truck Tires" 2/13/06.
- Michelin Technical Bulletin PM-06-02 "Service Life of Passenger Car and Light Truck Tires Including Spare Tires".
- Cooper Service Bulletin No. 112 (Service Life)
- "Research Report to Congress on Tire Aging"-NHTSA, Aug. 2007

## Belt wedges:

- U.S. Patent 3,717,190 Feb. 20, 1973

## Rubber Penetration of steel belt cabling:

- "More on Steel For Tires" by O. Drica-Minieris (Goodyear Tire) in Wire Journal. 1/1978.
- "Improving Rubber Penetration and Adhesion Elimination of Corrosion by W. Schiesser (Schiesser Rubber Technology) at ITEC 1998.

# APPENDIX

## Liner Pattern Marks :

- "Watch for the Diamonds" by M. Bozarth in Tire Retreading/Repair Journal 9/1993.
- Communication from Ronald Smith on liner pattern marks and other topics dated 1/25/2000.  [See following document.]

January 25, 2000

Mr. Bruce R. Kaster
Green, Kaster and Falvey, P.A.
Attorneys At Law
123 N.E. First Avenue
Ocala, FL 34470

The following opinions and conclusions are based upon my education and analysis of tires which have failed in actual use:

1.  The presence of bare wire in a tire which has experienced a tread belt separation is an indication of poor adhesion.

2.  One should not normally observe a brassy color to wire that has been exposed due to a separation. The observance of a brassy color on exposed wire is an indication of very poor adhesion. When wire is exposed in a delamination it should have a dark color rather than a brassy color.

3.  Nylon strip overlays or Nylon safety strips are effective in eliminating belt edge separations. They are not universally used in steel belted radial passenger tires due to the additional cost factor.

4.  Manufacturing plant conditions can have adverse effects on tire performance or early failures initiated by belt edge separation. High humidity and/or high levels of ozone in the manufacturing area can cause undesirable oxidation of exposed wire surfaces resulting in lowered cured adhesion and undesirable dynamic adhesion problems. Excessive use of solvent "freshener" on rubber surfaces prior to tire fabrication can result in a contamination of the surfaces by a thin film of rubber that can adversely affect long term adhesion of rubber surfaces.

5.  Improper curing conditions can lead to tread belt separation. One indication of improper curing conditions would be the presence of certain markings on the separated surfaces. These markings, caused by the imprint of temporary liners used in the factory to separate components before building the tire, indicate that the tire component surfaces had never completely fused together during cure. Another indication of faulty tire would be extensive areas of exposed wire in the delaminated surface of the used tire failure.

Sincerely,

Ronald W. Smith
2450 Clarke Drive
Lake Havasu City, AZ 86403
(520) 855-8725

**DE SANTIAGO, C.**
1586-000521

44

**EXHIBIT 2**

1  FENNEMORE CRAIG
   William L. Thorpe (No. 005641)
2  Scott Day Freeman (No. 019784)
   3003 North Central Avenue
3  Suite 2600
   Phoenix, Arizona  85012-2913
4  Telephone:  (602) 916-5000
   E-mail:  wthorpe@fclaw.com
5  E-mail:  sfreeman@fclaw.com

6  Attorneys for Defendant
   Bridgestone Firestone North American Tire,
7  LLC

8                    UNITED STATES DISTRICT COURT

9                        DISTRICT OF ARIZONA

10

| | |
|---|---|
| Angel Juarez Moreno, individually and as surviving spouse, and on behalf of all statutory beneficiaries of Antonia de Santiago Castillo, deceased; et. al., | Case No.: CIV 07-889-PHX-NVW |
| Plaintiffs, | **BRIDGESTONE FIRESTONE NORTH AMERICAN TIRE, LLC'S INITIAL RULE 26 DISCLOSURE STATEMENT** |
| v. | |
| Bridgestone/Firestone, Inc., an Ohio Corporation; Bridgestone/Firestone North American Tire, L.L.C., a Delaware limited liability company; Bridgestone Americas Holding, Inc., a Nevada corporation; Bridgestone Corporation, a Japanese corporation; Black and White Corporations I-X; Black and White Partnerships I-X; John Does 1-10, Defendants. | |

21        Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendant

22  Bridgestone Firestone North American Tire, LLC, a successor to Bridgestone/Firestone,

23  Inc., ("Firestone") discloses the information set forth below concerning potential

24  witnesses, documents, damages, and insurance coverage.

25        These disclosures are based on information reasonably available to Firestone at this

26  time.  Firestone has not completed its investigation of the facts of this case.  Firestone

does not intend such disclosures to be a waiver or limitation of any privilege, immunity, or other right of Firestone.

**A.** **Individuals believed to have discoverable information and subjects of such information.**

1)     Angel Juarez Moreno.   Mr. Moreno is expected to have knowledge regarding the accident, events leading up to the accident, and subsequent events.  He may also possess knowledge regarding the maintenance of the vehicle and the tires on the vehicle.

2)     Beatriz Moreno de Santiago.  Ms. Santiago is expected to have knowledge regarding the accident, events leading up to the accident, and subsequent events.  As the purported owner of the vehicle, she may also possess knowledge regarding the maintenance of the vehicle and the tires on the vehicle.

3)     Andres Juarez de Santiago.   Andres Santiago may have knowledge regarding the accident, events leading up to the accident, and subsequent events.

4)     Angel Juarez de Santiago, Jr.   Andres Santiago may have knowledge regarding the accident, events leading up to the accident, and subsequent events.

5)     Jessica de Santiago.   Jessica de Santiago Andres Santiago may have knowledge regarding the accident, events leading up to the accident, and subsequent events.

6)     As yet unidentified individuals who performed maintenance or repairs on the vehicle and/or tires before to the accident.

7)     Abraham Gomez.  Mr. Gomez is an official with the Mexican Federal Police and is expected to have knowledge regarding the accident and subsequent investigation.

8)     Jesus Quinones.  Mr. Quinones is an official with the Mexican Federal Police and is expected to have knowledge regarding the accident and subsequent investigation.

9)     As yet unidentified individuals who removed the subject vehicle from the accident scene and/or were in the chain of custody of the subject vehicle, the subject tire and companion tires.

10)     As yet unidentified individuals involved in the accident investigation.

11)     As yet unidentified healthcare providers who treated plaintiffs for their injuries.

In addition, there are numerous Firestone employees who may have information that bears significantly on plaintiffs' claims or Firestone's defenses. However, at the early stage of this case, Firestone has not completed a full forensic examination of the subject tire. Moreover, it is unclear to Firestone what plaintiffs' specific liability allegations will be beyond what is contained in plaintiffs' Complaint. Once Firestone has completed a full forensic examination of the subject tire and once plaintiffs have clarified their liability allegations, Firestone will be in a position to identify the employee or employees who may have information bearing significantly on plaintiffs' claims or Firestone's defenses.

Firestone incorporates by reference individuals identified by other parties. Firestone reserves the right to supplement this disclosure as discovery progresses.

**B.     Description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody, or control of Firestone.**

Firestone has been unable to learn what, specifically, Plaintiffs claim is wrong with the subject tire. Firestone will make available to Plaintiffs for inspection and copying, pursuant to Rule 26 and 34 of the Federal Rules of Civil Procedure, and consistent with the Local Rules of the United States District Court for the District of Arizona, documents within the categories described below. In providing these specific categories, Firestone does not intend to state, and the listing should not be construed to mean, that Firestone has possession, custody, or control of documents in any such category that are not privileged, do not constitute work product, or are otherwise discoverable. Rather, the listing of the

1   categories means that, to the extent Firestone has possession, custody, or control of

2   discoverable documents that may be relevant to Plaintiffs' claims or the defenses that it

3   may assert in this action, Firestone believes that such documents are within one or more of

4   the specified categories.

5       Certain documents within the categories identified below contain confidential

6   research, development, and commercial information, as contemplated in Rule 26(c)(7).

7   Any such documents, if otherwise discoverable, will only be made available for inspection

8   and copying subject to entry of an appropriate order protecting Firestone's confidential

9   research, development, and commercial information from unlawful, unjustified, or

10  improper disclosure.

11      The location of categories of documents identified below refer to the location at

12  which any discoverable documents within such categories are ordinarily kept and

13  maintained in the ordinary course of Firestone's business.

14      Firestone will make available to plaintiffs a repository of documents containing

15  information related to LT265/75R16 Steeltex Radial A/T tires and other tires, as described

16  below.

17      On September 29, 2000, the National Highway Traffic Safety Administration

18  ("NHTSA") initiated a preliminary evaluation, PE00-040, of certain Firestone Steeltex

19  R4S, R4S II and Radial A/T steel belted radial tires pursuant to 49 U.S.C. § 30101, et seq.

20  That investigation was closed on April 9, 2002, with NHTSA finding no "specific design

21  or manufacturing defect."  As part of the investigation, Firestone provided the Agency

22  with a variety of data and information related to the Steeltex R4S, R4S II and Radial A/T

23  tire lines.   In addition, Firestone has collected centrally available and reasonably

24  accessible documents related to the design, development, testing, manufacture, warranty

25  practices, adjustments, and lawsuits and claims involving tread separations for Firestone

26  Steeltex R4S, R4S II and Radial A/T tires.  Firestone has combined a copy of its initial

1  response to NHTSA's request, and any supplemental submissions, and the additional

2  documents referenced above, organized as they were kept in the usual course of business,

3  into a single collection (the "Steeltex document collection"). In responding in this broad

4  manner, Firestone is not waiving any objection to the scope of plaintiffs' discovery, nor to

5  the use of this information in any further proceeding, including trial. Information

6  regarding other, different tires is irrelevant and not reasonably calculated to lead to the

7  discovery of admissible evidence.

8      The Steeltex document collection is available on CD-ROMs, together with

9  software for viewing or printing the imaged pages. Firestone will provide plaintiffs with a

10  copy of the CD-ROMs upon the payment of the cost of their preparation. Firestone

11  believes that this is the most cost-effective and timely manner for counsel for plaintiffs to

12  receive the documents in the Steeltex document collection. However, at plaintiffs'

13  request, the Steeltex document collection can be printed to hard-copy and produced upon

14  payment of the cost of printing.

15      Many of the documents included in the Steeltex document collection contain

16  information which is considered proprietary and confidential. For example, many of the

17  documents submitted to NHTSA were granted confidential status pursuant to 49 C.F.R. §

18  512. Therefore, the Steeltex document collection will be provided subject to the prior

19  entry of a suitable protective order.

20      Subject to and in accordance with the foregoing, Firestone identifies the following

21  documents, electronically stored information, and tangible things in its possession,

22  custody or control that may bear significantly on any claim or defense:

23      Category 1:  Specification, mold, and tread drawings for the subject tire. This

24  information can be made available pursuant to a Protective Order entered by the Court.

25      Category 2:  Adjustment data covering tires built to the same specification as the

26  subject tire. Data for one month prior through one month after the date of manufacture of

1    the subject tire. This information can be made available pursuant to a Protective Order

2    entered by the Court.

3          Category 3: A variety of safety and servicing literature and information is

4    disseminated throughout the tire sales industry. This type of information is far too numerous

5    and varied to specifically describe; however, tire care and service materials have generally

6    been made available to the public by defendant, as well as by other sources, including other

7    tire manufacturers, the National Highway Traffic Safety Administration (NHTSA), state

8    departments of motor vehicles, various magazine publications, vehicle manufacturers and

9    retailers. Upon request, defendant can produce examples of such literature.

10          Category 4: Quality Control Flow Chart.

11          Category 5: Applicable Tire Maintenance, Warranty and Safety Manual.

12          Category 6: DOT 119 Federal Motor Vehicle Safety Standard testing.

13          Category 7: Personal injury claims and lawsuits involving tires of the same size and

14    type manufactured to the same specification as the subject tire and involving substantially

15    similar circumstances up to the date of the accident alleged in Plaintiffs' complaint. This

16    information can be made available pursuant to a Protective Order entered by the Court.

17          Category 8: The Owner's Manual for the 2000 Ford Excursion.

18          Category 9: The subject vehicle.

19          Category 10: The subject and companion tires.

20          Category 11: The purchase and maintenance records pertaining to the subject

21    vehicle, the subject tire and companion tires.

22          Category 12: Photographs of the subject vehicle, subject tire, companion tires and

23    accident scene.

24          Category 13: Accident Report prepared by Mexican authorities.

25          Category 14: Autopsy Report and photographs pertaining to Antonia de Santiago

26    Castillo.

1      Category 15: Title records pertaining to the subject vehicle.

2      Category 16: Insurance File pertaining to the subject vehicle.

3      Category 17: Driving record pertaining to Angel Juarez Moreno.

4      Category 18: Medical records pertinent to the allegations of the Complaint.

5      Upon the Plaintiffs' request, Firestone will produce or make available for

6 inspection and copying those documents referenced above which are in its custody or

7 control and not already available to plaintiffs, at a mutually convenient date and after the

8 entry of an appropriate Protective Order, where necessary.

9      Defendant incorporates by reference those documents and things listed by Plaintiffs

10 their Disclosure Statement.

11      **C.**    **Computation of Claimed Damages.**

12      Firestone claims no damages in this action.

13      **D.**    **Insurance Agreements.**

14      Firestone is self insured sufficiently to satisfy any judgment that may be entered

15 against it in connection with this action.

16      DATED this 16th day of August, 2007

17                              FENNEMORE CRAIG, P.C.

18

19               By

20                        William L. Thorpe
                                   Scott Day Freeman

21                        Attorneys for Defendant
                                   Bridgestone Firestone North American

22                        Tire, LLC

23

24

25

26

1    ORIGINAL mailed this 16th
2     day of August, 2007 to:

3    Linda B. Williamson
     Lucia Stark Williamson LLP
4    2700 North Central Avenue
     Suite 1400
5    Phoenix, Arizona 85004-1133
     Attorneys for Plaintiffs
6

7    COPY mailed this same date to:

8    Roger S. Braugh, Jr.
     Sico, White & Braugh L.L.P.
9    802 North Carancahua
     Suite 900
10   Corpus Christi, Texas 78470
     Attorneys for Plaintiffs
11

12   By: _____
13

14

15

16

17

18

19

20

21

22

23

24

25

26

FENNEMORE CRAIG
PROFESSIONAL CORPORATION
PHOENIX

1946733

- 8 -

**EXHIBIT 3**

## LARSON, GARRICK & LIGHTFOOT, LLP

**US BANK TOWER**
**633 W. FIFTH STREET**
**SUITE 1750**
MARY P. LIGHTFOOT, ESQ.     **LOS ANGELES, CALIFORNIA 90071**     FILE NUMBER:
MLIGHTFOOT@LGL-LAW.COM     **TEL.: (213) 404-4100**     1701-1456
**FAX: (213) 404-4123**

September 25, 2008

**VIA FACSIMILE**

Roger S. Braugh, Jr.
SICO WHITE & BRAUGH LLP
900 Frost Bank Plaza, 802 North Carancahua
Corpus Christi, Texas  78470

    Re:   *Maria Cisneros, et al.  vs. Ford Motor Company, et al.,*
           LACSC Case No. BC 360783

Dear Mr. Braugh:

    It has come to my attention that you and your office have been provided with a hard drive containing Firestone's Steeltex collection by John Rowell from the California case entitled, *Cisneros.*  These documents and any copies made of them need to be returned to Mr. Rowell or destroyed, in accordance with the terms of the Protective Order in *Cisneros.*

    In a telephone conversation I had with Mr. Rowell today, he confirmed that he had in provided the Steeltex collection to you, and that he was asking you to provide an executed Exhibit "A" as soon as possible.  He also mentioned that you have provided some of these documents to your expert, Troy Cottles.  I am hereby requesting confirmation in writing from you and Mr. Cottles that all such documents have been deleted from any and all hard drives or other media, and/or that any and all hard drives/copies of such documents have been destroyed or returned to Mr. Rowell.

    Mr. Rowell mentioned that you may have filed some of the documents with the Court in a case that you are handling outside of California; if so, please identify all such documents, the case name and number, and under which Protective Order they were filed.

    **Please provide me with these written confirmations and the requested information today, if possible, so that we can ensure compliance with the Protective Order and move forward in closing out the *Cisneros* matter.**   Your prompt attention to this issue will be greatly appreciated by all concerned.

                          Very truly yours,

                          MARY P. LIGHTFOOT

MPL:amn

cc:  John D. Rowell - via facsimile only

**EXHIBIT 4**

## FREEMAN, SCOTT

| | |
|---|---|
| From: | FREEMAN, SCOTT |
| Sent: | Monday, September 29, 2008 3:37 PM |
| To: | 'Roger S. Braugh, Jr.' |
| Cc: | Tom Woodrow |
| Subject: | RE: Moreno/de Santiago |

Thank you Roger.  Glad to see that you guys are no longer bailing water.  I am happy to request that the disk drives containing the Steeltex Collection be prepared per Firestone's offers in its disclosures and discovery responses.  In the past when we discussed this, you had indicated that you were not interested in having us produce the Steeltex Collection in this case, in part, because you possessed the Steeltex collection from the Cisneros case.  From speaking with Mary Lightfoot, I understand that you have agreed to return those documents to her.  I am not prepared at the moment to address your other comments.  I would, however, refer you to my e-mail of June 26 wherein I addressed certain document queries made at that time.

-----Original Message-----
From: Roger S. Braugh, Jr. [mailto:rbraugh@swbtrial.com]
Sent: Monday, September 29, 2008 2:17 PM
To: FREEMAN, SCOTT
Cc: Tom Woodrow
Subject: Moreno/de Santiago

Scott:

Can you please let me know why I have no Steeltex Collection produced in this case, have no original spec for my tire, and have no adjustment data for LRE Steeltex made with and without nylon cap plies so that I can test Firstone's position that cap plies made no difference whatsoever in belt failure rates?  Recall that Firestone's company rep testified that there are no substantial differences between the Aiken and other LRE Steeltex.

Thanks,

Roger S. Braugh, Jr.
Sico, White, Hoelscher & Braugh L.L.P.
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78470
(361) 653-3300
(361) 653-3333 (fax)
rbraugh@swbtrial.com