# EXHIBIT B

Roger S. Braugh, Jr. (Pro Hac Vice)
**SICO, WHITE, HOELSCHER & BRAUGH L.L.P.**
802 N. Carancahua, Suite 900
Corpus Christi, TX 78470
Telephone (361) 653-3300

Linda B. Williamson (No. 009891)
**LUCIA STARK WILLIAMSON LLP**
2700 N. Central Ave., Suite 1400
Phoenix, Arizona  85004
Telephone: (602) 285-4400
Facsimile:  (602) 285-4483

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Angel Juarez Moreno, individually and as surviving spouse, and on behalf of all statutory beneficiaries of Antonia de Santiago Castillo, deceased; et. al.,<br>                    Plaintiffs,<br><br>v.<br><br>Bridgestone/Firestone, Inc., an Ohio Corporation; Bridgestone/Firestone North American Tire, L.L.C., a Delaware limited liability company; Bridgestone Americas Holding, Inc., a Nevada corporation; Bridgestone Corporation, a Japanese corporation; Black and White Corporations I-X; Black and White Partnerships I-X; John Does 1-10,<br>                    Defendants. | No. CIV 07-889-PHX-NVW |

STATE OF ALABAMA                )

LIVINGSTON COUNTY              )

## AFFIDAVIT OF TROY COTTLES

Before me, the undersigned, a Notary Public in and for the State of Alabama at

Large, personally appeared Troy Cottles, who is known to me and who being by me

first duly sworn, on oath deposes and says as follows:

-1-

"My name is Troy Cottles.  I am over the age of nineteen (18) years of age and have personal knowledge of the facts stated herein:

## Qualifications

By education, training and experience, I am an expert in tire failure analysis and tire design/manufacture.  I was employed in the tire industry for 17 years with Dunlop Tire Corporation (Dunlop was later purchased by/merged with Goodyear, becoming Goodyear-Dunlop Tires North America, Ltd.), designing, manufacturing, and testing steel belted radial tires such as the one involved in this case, and other types of tires as well.  Through durability testing I have evaluated hundreds of tires with belt to belt adhesion failures, many with the specific goal of determining design, manufacturing, and/or service conditions that were responsible for the failures in representative groups of tires, and how to better design tires to avoid such failures in the future.  Additionally, I examined many tires which were returned from the field that demonstrated various failures including belt to belt adhesion failures.  For a period of time from 1994 to 1996, I was responsible for the evaluation of the tires returned through various automotive customers' warranty departments regarding the acceptance of those claims for workmanship and material defects.  My report and CV are true and correct statements of my opinions and qualifications, and are incorporated herein in their entirely.

As reflected in my CV, my formal advanced education consists of a 1988 Bachelors of Science (B.S.) degree with a Mathematics/Physics minor from Athens State University.  I also engaged in Mechanical Engineering study at the University of Alabama, Huntsville (I did not complete a degree there).  I also received extensive

-2-

education in the form of on the job training during my 17 years in the tire industry. I was trained and have experience in all aspects of tire design and failure analysis. I also participated in a specific three month design study with Sumitomo Rubber Ind., Ltd. Kobe, Japan, and specific training in Design Failure Mode and Effects Analysis (DFMEA).

My 17 years of experience in the tire and rubber industry began in 1988 working for Dunlop Tire Corporation in Alabama, and culminated with a promotion to the position of technical director of tire development for Goodyear-Dunlop Tires N.A. Ltd. (the various Dunlop and Goodyear entities are for the remainder of this affidavit referred to as "Dunlop" for ease of reference). While with Dunlop, I provided direct technical input into passenger and light truck Original Equipment (OE) products. Included among my most recent job functions, I provided direct technical support on product liability issues including reviewing claim tires (essentially the same type of forensic work I am performing in this case, but for the tire company), providing documentation and drawings, interpreting technical specifications, and providing background on original design requirements. I have held several senior manager positions in OE tire design, and have had responsibility for overseeing the design programs for tires to be supplied to multiple automobile manufacturers including Honda, Mercedes, Toyota, and Nissan. Additionally, while in the position of Senior Technical Manager for Dunlop, I worked responsibility for and involvement with the product integrity test laboratory. Testing within that laboratory included tire endurance, regulatory, and force/moment measurement testing. In short, I have had extensive exposure to and direct involvement in virtually

all aspects of the tire manufacturing business, ranging from manufacture to testing to design.  I have also had extensive exposure to and involvement in the study of what causes steel belted redial tires to fail by mechanisms such as tread separation, and how to prevent such failures.  Dunlop, as reflected by the positions I held, considered me qualified to conduct scientific analysis of tires and perform forensic analyses of what caused tires to fail, and much more.  There is nothing I have done in this case which I did not do in a professional capacity for Dunlop, with the exception of litigation specific things such as offer testimony and write reports for use in Court. The substance of what I have been asked to do in this case is very much a subset of what I was paid to do for years by Dunlop.

Throughout my career working for Dunlop, I was required to focus on cost containment and achievement of the company's financial goals in conjunction with other objectives such as quality control and product innovation.  In addition to having extensive experience in determining how and why a tire failed in a certain way and how to improve upon tires to avoid such failures, I also have direct and real world experience in issues such as the economic feasibility of alternative designs.  I have extensive training and experience in considering the balancing of cost with function and safety.  For example, when addressing alternative designs of tires, I would factor in how such designs can and should be implemented in a cost-competitive industry such as the tire industry. I followed this method while working both in the tire industry and as a consultant.  While working at Dunlop, I was directly responsible for designing tires that were both safe (including having appropriate resistance to catastrophic failure including tread separation failure), and cost

effective.  Among other things, I worked directly at the manufacturing sites where a majority of the tires I designed were being produced.  This facilitated a regular exchange between design engineers and production/process/tire construction engineers on the shop floor as the tires were being built stage by stage throughout the process, allowing me to participate in the manufacturability of certain tire designs being launched at a given facility.  I physically manufactured tires myself for a short time of several months.  For the 17 years I was employed in the industry, I was in a plant environment for all but two and a half of those years.  Early in my career, I was tasked with not only focusing on the cured tire performance and design, but also producing the green component specifications which would ultimately be used to build the tire to meet my design in each factory.  Further, I launched products in Goodyear's Medicine Hat, Canada plant, Goodyear's Freeport, IL plant, Dunlop's Huntsville, AL plant, Dunlop's Buffalo, NY plant, Goodyear's Lawton, OK plant, and Goodyear's Union City, TN plant.  I was asked to several of these plants by the plant managers or technical managers regarding new tire trials and releases to production. I have also observed the manufacturing sites of Sumitomo in Japan (Shirakawa, Nagoya, and Kobe) as well as Dunlop's Hanau, Germany plant.  So when I offer opinions in a case that a tire was unsafe or defective and that it could have been corrected in an economical manner with alternative designs, I am speaking from direct experience in an industry where I was charged with that specific job responsibility in a real world environment, and where I achieved those specific goals multiple times during my career.

I am a member of the Society of Automotive Engineers.  I have personally designed, engineered, and developed through manufacturing, testing, and failure analysis many original equipment P-Metric and Hard Metric steel-belted redial tires, as well as radial and bias ply ATV tires.  I have co-developed with rubber compounders and materials technologists many different tire materials, including, but not limited to, different tire materials, different tire ply materials such as nylon and polyester, different types of the rubber fillers (carbon blacks, silicas, and others), and different types of rubber formulations (recipes) for treads, side walls, bead fillers, innerliners, chafers, and other skim rubbers for tires.

I have personally performed, authorized, observed, and/or analyzed numerous tests, including, but not limited to:

a.     United States Department of Transportation, Fair Motor Vehicle Safety
       Standards Tests (also known as "FMVSS") 109 and 119;

b.     Running tires at high speeds to failure;

c.     Running tires in an overloaded condition to failure;

d.     Running tires in an underinflated condition to failure;

e.     Durability tests to test the strength of the rubber and the skim
       compounds;

f.     Visual, tactile, magnified, microscopic, and x-ray examinations of failed
       tires.

I was trained to segregate tires with cord shadows from submissions to customers who were conducting durability testing due to the influence a thin innerliner was know to have on tire durability.

-6-

I was asked to leave Dunlop/Goodyear in July, 2005, when the company learned that I was looking for employment and/or consulting work that would allow me to live closer to my family in Alabama (I was working in Goodyear's facility in New York state at the time, though I started my career with the tire industry in Alabama). Among the companies I was talking to about possible new employment was Toyo Tire. My employer told me that they did not consider it appropriate for me to be looking for a new position while still employed with the company, they told me that they considered my job/consulting inquiries to be a violation of my employment agreement, and so they asked me to leave. I had received a promotion just a few weeks prior.

**My Methodology**

In conducting my analysis of the cause(s) of the tire failure in this case, including the analysis of potential design and manufacturing issues, as well as installation and maintenance issues and service issues that potentially contributed to the failure, I followed a well known and accepted methodology prevalent in the industry and also utilized routinely by tire company experts in the litigation context. This methodology as explained in more detail below involves several steps, including: 1) detailed physical examination of the tire; 2) x-rays of the tire to inspect its internal structure; 3) a review of tire company documents produced in the case, including any tire specification, and finally 4) consideration of my experience and training as well as secondary sources and literature made part of my expert report to arrive at specific conclusions. In this case, I was provided with the subject tire, two

tread pieces, and rim. I was given specific information about the accident itself, including the police accident report.

I examine tires that have been involved in tread separation accidents in a specific manner, which is the same manner used by other tire experts, both plaintiff and defense. I have confirmed this by meeting and discussing this topic with other tire experts. It is also the same manner that I used while working in the tire industry for Dunlop. It is also consistent with what Firestone's core tire expert in this case, Joseph Grant. As indicated in his report, Mr. Grant uses a visual examination, took measurements, obtained information about the accident itself, and determined that the tire was non-defective based strictly on the examination of the tire, a review of literature and his own experience and training in the tire industry. This is the same methodology I employed in this case.

My methodology is the same methodology used in the tire industry for determining causes of tire failures and the existence of defects. Tire manufacturers train their employees to physically inspect failed tires returned to the company for warranty (adjustment) consideration, to look for various external signs of what caused the tire to fail, and to make specific findings regarding whether the tire failed due to a specific type of defect or due to other causes. This involves essentially a shortened and simplified version of what I do as a forensic tire expert (among other things, my examination takes several hours, whereas typical tire company employees involved in adjustment analysis may spend only a few minutes looking at a given tire and rendering a decision about what caused it to fail). A large portion of tire forensic failure analysis involves a physical inspection of failed tires and an analysis of the

various physical attributes and signs that tell the examiner what caused the tire to fail.

It is worth mentioning that there is <u>not</u> a great deal of published information or literature that exists concerning the scientific methodology to be employed by a forensic examiner. This is largely because the tire industry is very competitive and secretive. I have been involved in numerous tire cases involving many different manufacturers and, for the most part, all of the tire documents produced in those cases were deemed trade secrets and hence confidential. Virtually all engineering and other scientific studies conducted by tire manufacturers of what causes its and its competitor tires to fail, and even basic information such as the number of particular tires that are returned to the tire manufacturer that were classified as having failed for specific reasons is considered a trade secret. It is a fact that tire companies do not publish or make publicly available their training information or data related to tire failure forensics beyond what is done by field personnel and referenced above. Furthermore, most of the training received by tire company employees who are charged with the more advanced scientific and forensic analysis of tire failures, such as myself, is done largely through on the job training by others, e.g., it is not reduced to writing in a specific training manual or other material that could be attached to an affidavit such as this even if a tire company were willing to allow it to be used.

As I was trained to do by Dunlop, the objective of my examination in this case was to try to determine the cause(s) of the tire failure, both by finding objective physical evidence of the cause and by looking for the absence of conditions that are known causes of tire failures including tread separation failures specifically. The

examination starts with a visual examination of the outside of the tire, including sidewalls and beads, carcass and tread. Tire markings and codes are inspected. Measurements are made of locations of markings and abnormalities. Then the inside of the tire is inspected visually. Close attention is given to any punctures, innerliner problems, including splices, cuts, or other abnormalities. At the same time, a tactile inspection is made. All surfaces, both exterior and interior, are felt for abnormalities.

Various devices were used in this tire examination, including spreaders, high intensity lights, magnifying devices, laser non-contacting devices, and microscopes. X-rays were done in this case. The subject wheel (rim) was closely inspected. I took photographs of the condition of the subject tire to document and show its condition. Also as noted above, as important as the positive findings on the tire is the absence of certain signs on the tire. Most user-caused conditions will leave tell-tale signs on the tire. Their absence is strong evidence that the tire was not significantly, adversely affected by improper maintenance. I look for both evidence of misuse and a lack of evidence of misuse. This is the method that I used in the examination of the subject tire.

In conducting my visual inspection, I made specific findings as reflected in my previously furnished report, including as follows:

```
Tire:              LT265/75R16 123/120Q  FIRESTONE STEELTEX RADIAL A/T
DOT:               8XW8 1XL 2601 (AIKEN, S.C.)
Construction:      2 ply polyester + 2 steel
Max. Inflation:    80 PSI
Max Load:          (3415 lbs)
Tire Position:     LR
E4—008062
```

Evidence was available for inspection as follows:

- The subject tire with a full tread/#2 belt separation.
- Two tread pieces
- Subject rim.

The tire was marked in the following manner to help with the orientation of my observations:

The DOT (found on the serial side of the tire's sidewall, called SS in my report) was considered the starting point or 0 degrees. Rotating clockwise around the sidewall, my inspection notes were taken in increments of 30 degrees. The opposite side of the tire was evaluated in the same way; however, rotating counterclockwise in order to be consistent side to side. The tread and carcass were also measured in increments of 30 degrees starting above the DOT.

(SIDEWALL SS-SIDE)-(bsw)

- Rim groove (4.8 x 0.4).
- Cracking at S-diameter.
- No splits this sidewall.
- At 65 degrees, clip impression.
- From 45 to 90 degrees, approximately 145mm bead toe tear exposing ply cords.
- At 295 degrees, clip impression.
- At 320 degrees, clip impression.

(SIDEWALL SOS-SIDE)-OWL

- Rim groove (5.2 x 0.5)
- From 0 to 45 degrees, bead toe/ledge tear.
- At 10 degrees, upper sidewall abrasion into WSW through coverall.
- At 265 degrees, abrasion in mid-sidewall.
- At 275 degrees, clip impression.
- At 315 degrees, clip impression.
- From 315 to 45 degrees, bead toe/ledge tear.

(INSIDE TIRE)

- At 5 degrees, heavy ply splice – 8 cord overlap.
- At 55 degrees, SS-side, rip in innerliner.
- At 80 degrees SOS-side, patch repair. Appears well sealed.
- At 100 degrees, wide innerliner splice on slight angle.
- Cord shadows throughout.
- At 350 degrees on SOS-side, 2 rips in innerliner.

(CARCASS)

- Some tread flap remains on either shoulder on the carcass.  The majority oon SS-side.
- At 0 degrees on SS-side, trapped air channel at shoulder.  At SOS-side, raised #1 belt wire overlap.  Three strips of #1 belt stripped in belt, not broken.  Lifted from carcass.
- At 15 degrees on SS-side, rubber reversion zone, beach marks, and reversion continuing beyond the crescent zone.
  - C/L-2 broken #1 wire filaments.
  - SOS-missing #1 belt cable.
    - Raised #1 belt cable with irregular wire spacing.
- From 0 to 15 on SOS-side, rubber reversion.
- From 0 to 60 degrees on SOS-side, - 13 undulations.
- At 30 degrees on C/L, broken #1 belt filaments and loose cable.
  - SOS-side, broken #1 belt filament and loose cable.
  - Gapped, irregular wire spacing.
  - Reversion and polishing along shoulder.
- At 35 degrees on C/L, lifted #1 belt filament.
- At 45 degrees on SS-side, gapped and overlapped #1 belt splice.
  - Peak in rubber reversion crescent zone – 60mm.
- From 45 to 105 degrees on SOS-side, major rubber reversion crescent zone.
- From 45 to 120 degrees on SOS-side, approximately 12 tread pitches available on tread flap.
- At 55 degrees C/L, approximately 6 broken wire filaments.

- At 60 degrees SS to C/L, approximately 5 broken wire filaments.
- At 75 degrees on SS-side, overlapped and gapped #1 belt splice.
- At 100 degrees on C/L, 2 broken #1 wire filaments.
- At 105 degrees on C/L, 1 broken #1 wire filament.
- At 115 degrees on SOS-side, trapped air smoothness on skim.
- At 135 degrees on C/L, spread #1 belt cables.
- From 135 to 165 degrees on SOS-side, cracking in belt skim.
- At 145 degrees on SS to C/L, broken #1 wire filaments.
- From 145 to 175 degrees on SS-side, polishing on belt skim.
- At 175 degrees on SS-side, trapped air smoothness on skim.
- From 225 to 0 degrees on SS-side, heavy trapped air channel and cavity on skim to the #1 belt wires.
- At 270 degrees on SOS-side, spread belt cables.
- At 325 degrees on SS-side, raised and gapped #1 belt splice.
- Belt wire type: 1x7.
- Shoulder undulations "necking" at deep shoulder grooves.

AIR LEAK TEST CONDUCTED:  No leaks, except on SOS-sidewall in the "X" in "Steeltex".

(TREAD)

- 2 tread pieces available.
- Tread piece-A is from 240 to 60 degrees on SS-side.  (285 to 60 degrees on SOS-side).

Tread Piece A:

-13-

- SOS-full belt edge lifted from tread.
- At 60 degrees, approximately 11 strands of #3 belt wire.
  - On SS-side, main groove impression from tread – 4.1mm high under tread (this is higher than the adjacent groove).
  - Tread poorly bonded to #2 belt skim.
- At 45 degrees on SS-side, stray belt wire embedded.
  - Impression of #1 belt splice.
- From 30 degrees to end of tread piece, trapped air channels on SS belt edge and inboard from – 85mm of the SS belt edge.
- From 60 to 315 degrees on SOS-side, rubber reversion on skim.
- From 30 degrees to end of tread piece on SS-side, 12 to 13 #2 belt strips.
- At 315 degrees, adhesion-arrest mark and fretted SOS wire ends.
- Light liner pattern marks beneath tread on skim.

Tread Piece 2:

- One end with – 11 strips of #2 belt wire fretted at ends.
- Reversion on belt skim at belt edges.
- Trapped air disturbance to wire impressions.
- Raised #2 belt splice.
- -5 adhesion-arrest marks.
- -11 strips on opposite end of #2 belts.
- #2 belt width – 190mm.
- Tread block width – 205 mm.

(SUBJECT RIM)

- 16x7 Ford alloy 8 bolt holes.
- No outboard markings.
- "2091" next to valve stem.
- Inboard 16x7K DOT-T Ford 2 040400 F81A-1007-LB
- X1587J
- Valve core installed, no valve cap.
- 2 oz. clip weight outboard.
- Rim flange damage (bent – 84mm long).
- No inboard clip weights.
- No damage noted inboard.
- Only rim flange damage noted outboard.

(SUBJECT TIRE XRAYS)

Film 0 degrees:

- Irregular belt spacing.
- - 3 broken wire filaments.
- Dog-eared splice in #1 belt with wire contact.

Film 30 degrees:

- Scalloping on belt edge.
- Abraded wire filaments.
- Irregular spacing.

Film 60 degrees:

- Scalloping belt edges.
- Wide, gapped belt splice.

- Abraded wire filaments in contact area.

- Irregular wire spacing.

Film 90 degrees:

- Spread cables.

- Wide, gapped splice.

- Broken wire filament.

Film 120 degrees:

- Irregular wire spacing.

- Abraded wire filaments.

Film 150 degrees:

- Irregular wire spacing.

- Scalloping at belt edge.

- Wire to wire contact.

Film 180 degrees:

- Gapped splices with wire to wire contact along the splice.

- Irregular wire spacing.

- Kinked belt cables.

Film 210 degrees:

- Scalloping belt edges.

- Irregular wire spacing.

- Lifted belt filament.

Film 240 degrees:

- Scalloping belt edges.

- Irregular wire spacing.

- Wire contact in kinked belt area.

Film 270 degrees:

- Scalloping belt edges.

- Irregular wire spacing.

- Wire to wire contact.

- Spread wire cables.

Film 300 degrees:

- Irregular wire spacing.

- Lifted belt filament.

- Scalloping on belt edges.

Film 330 degrees:

- Wire to wire contact at splices.

- Spread cables.

- Irregular wire spacing.

- Kinked belts.

Film Tread 30 to 60 degrees:

- SOS belt ends are frayed and curled.

- #2 belt strips are lifted from tread.

- Wire spacing is irregular.


Film Tread 240 to 270 degrees:

- SS side wire ends are lifted, curled, frayed.

- Irregular wire spacing.

- Spreading of #2 belt wires at main grooves.

Film Tread 270 to 300 degrees:

- Both #2 belt edges show lifted wires, curled, and frayed.

- Wire on wire contact.

- Irregular wire spacing.

- Gaps in belt placement.

Film Tread 330 to 0 degrees:

- Both #2 belt edges are frayed, lifted, and curled.  More severe conditions on SS side.

- Irregular wire spacing.

- Spread belt wires over main grooves.

Film 2nd tread piece:

- Irregular wire spacing.

- Heavy fraying of the belt wire cable ends.

- Belt ends are all stripped.

- Gapped wire splice.

- Wire to wire contact.

- Spread cables.

- Wire overlap.

Once I had concluded my physical examination and documentation of my findings, I also conducted an x-ray analysis of the failed tire.  Again, I noted my

specific findings in my report, at pages 22 - 25.  I performed x-rays of the tire and tread fragments.  Of course the films are and have been made available for inspection by other experts.

The general methodology used by me in this case can be illustrated by reference to the government's investigation a few years ago into the tread separation failures experienced by Firestone after the tire company made certain changes to the structure and chemical composition in a variety of its tires.  Specifically, the National Highway Traffic and Safety Administration (NHTSA) in October of 2001 issued through its Office of Defect Investigation (ODI), a document entitled "Engineering Analysis Report and Initial Decision."  This was the federal government's report which sets forth a summary of its initial analysis of the root causes for tread separation failures being observed at the time in Firestone Wilderness AT and ATX tires.  Firestone "voluntarily" recalled its tires three (3) days later.  As explained in detail in the report, the federal government had the ability to examine forensically numerous failed Firestone tires and in fact they did so.  The government through its experts used many of the same techniques I use and which are outlined above in terms of forensic examination of failed tires.  The government also had the ability to conduct destructive testing of failed tires such as cross-sectioning of failed tires, but of course I cannot do that in this case because that would be considered alteration of the evidence in this case.

In my report at pages 26 through 32, I provide my analysis of what caused this particular tire to fail by tread separation.  I explain in detail all of my physical findings.

The analysis is set forth in an analytical manner which allows others in the same field to objectively consider and evaluate my conclusions.  As a final step in my analysis, I list a number of specific secondary sources which support my methodology, my analytical method, and my specific conclusions.  I have testified at numerous trials on tire failure analysis and tire design/manufacturing.  My opinions have never been excluded by any court of law.

*Discussion of Tire Failures and Their Causes*

Tire failures that involve a failure of adhesion among the internal components after several years of use such as the failure that occurred in this case generally do not occur for a single reason or due to a single defect in a tire.  There are exceptions of course, but the typical tire internal adhesion failure that occurs in the mid- or late-life of a tire involves a combination of factors and weaknesses in the tire that together produce the end result.  In this regard, it is often true that a multitude of poor design choices and/or manufacturing problems and/or service issues lead to the end result, and that it would be an over-simplification to choose just one or two of those factors as "The cause" of a given tire failure.

No one in the tire industry being truthful in my opinion would describe tire manufacturing as an exact science.  Tire designs change for a variety of reasons that often have little to do with what would make a "perfect" tire (e.g., cost, priorities such as noise or handling that change with the product, equipment limitations, raw material supply issues, etc), and the manufacturing process itself is subject to inherent margins of error.  Little known to the average consumer, the manufacture of a tire is still done largely by hand by human beings who physically handle tires and

their individual components at multiple stages.  Moreover, economic considerations sometimes dictate more about a design change than good science.

It is often the case that particular design or manufacturing considerations or particular service conditions are more important than others in what causes a tire to fail, but it is rare that a single cause can be identified without oversimplifying what occurred.  Because of these realities, the only reasonable goal of a tire company is to build sufficient safety into its tires to overcome a simple mistake in design or manufacture that may occur.  If a tire company fails to do, then in my opinion the tire lacks a sufficient margin of safety and is defective.  Yet the causes of the failure often will not be a single item but rather a long list of items that worked together to form a tire that was either overly prone to failure, or lacking in sufficient robustness to resist a premature failure.

The tire that failed in this case is an excellent example of this concept.  Here, there are a multitude of design factors that were chosen by BFS along with manufacturing anomalies that all contributed to an inherent weakness in the tire's structure, without many measures that could have made the tire more robust.  I have identified in my report and in my deposition testimony all of the various factors that I found to contribute to the tire failure.

*Discussion of the Reliability of My Opinions*

I have read and reviewed BFS's motion and brief to exclude my testimony.  I have been asked to comment upon the specific issues raised by BFS regarding my opinions in this case.

All of my opinions have been tested in various forms by Dunlop, but of course

I cannot independently establish this to be true because Dunlop does not publish such information or allow former employees such as myself to publish it for them in a lawsuit or other context.   Many of my opinions have been tested by various secondary studies and sources, which I reference in my report.   A detailed analysis of each and every secondary source that supports my opinions would consume weeks of effort because it would require detailed analysis of tens of thousands of pages of materials with respect to each of my opinions.   Instead, I have attempted below (and above) to give concrete examples of where my opinions have been and can be tested by the federal government specifically in its study of Firestone tread separation problems.   I chose this method solely because it is more efficient and it better accommodates the time and expense limitations that exist in the litigation context.

First, the opinions in my report generally reflect the same type of analysis and methodology done by the federal government.   As shown therein, the government took a variety of data ranging from tire company information to forensic examination of tires and determined the "root causes" of what was causing tread separation failures in Firestone tires.   Therein, the government listed a whole series of contributing causes as the "culprit" for the failures.   The government determined from its analysis that the entire set of literally millions of tires with the same design considerations were defective.   Here, I have taken a much more specific but similar approach (limited of course by not having the federal government's budget or power to compel information), and I have followed the scientific method to reach my conclusion about the root causes of this particular tire failure.   I have found that

several distinct weaknesses in the tire that contributed to the failure.

BFS has focused their <u>Daubert</u> challenge on three of my opinions/observations concerning defects in the subject tire.  Specifically, BFS contends that my opinions regarding rubber reversion, insufficient antidegradants, and liner pattern marks are not reliable.  I have been asked to comment on these attacks specifically.

In my former positions with Goodyear-Dunlop I was involved in, and responsible for, the development of tires from a design standpoint. As such, I was required to understand how the components that make up the finished product - the tire - worked.  When designing a tire, I was required to be aware of potential causes of failure including heat generation, retention, and oxidation within the rubber itself. This naturally decreases the amount of good rubber (with proper sulfur cross-links) that is available for bonding the two belt layers together, ultimately allowing the belts to lift free. In my experience, reversion in tires refers to the rubber degradation due to oxidation. After the oxidation occurs, the rubber reverts and no longer has the same elastic properties as it did post-cure.  In order to defray oxidation, tire manufacturers use antidegradants (chemicals), including antioxidants, to minimize the effect of oxygen and to protect the bond of the skim stock to the steel belt.

While I do not hold myself out to be a chemist and will not testify to the specific type of antidegradants that should have been used in the subject tire, through my training and experience, I am aware of what can happen to rubber and other components used in tires under various conditions, including heat, age, and stress. Based upon my experience and training in the tire industry, I can determine by a visual and tactile examination of the subject tire, that the rubber had begun to fail or

to revert.  As I indicated in my report, I identify these areas as "rubber reversion zones."  This demonstrates to me that whatever type of antidegradants/antioxidants were used in the design of the subject tire were obviously insufficient to last three years, the age of the tire at the time of its failure.  As indicated in my report, this lack of adequate antioxidant remaining in the belt skim stock contributed to the oxidative degradation of the tire.

In my report on pages 26 and 27, I have explained the rubber reversion and antidegradant issues and what they indicate in terms of a poorly designed and manufactured tire.  My opinions are based on my experience and training in the tire industry including the knowledge I gained as a member of tire design teams.  When designing tires, the teams were tasked with evaluating the chemical belt skim components to determine proper adhesion, robustness and elasticity.  The following tests were run to test the skim stock: durability and belt integrity testing (design test), carbon dispersion testing (chemist test), tread stripping testing (chemist test), wire to skim adhesion testing (chemist test), and belt to belt adhesion testing (design test).  Based on the review of the above tests coupled with analysis and discussion amongst the tire team, the tire chemist would then make modifications to the belt skim stock in order to reach ideal functionality and durability.

The experience I gained while designing tires and inspecting failed tires taught me to identify reverted rubber due to oxidation, evaluate the probable causes and implement changes to improve the tire's design.  In addition to my experience and training, I have cited papers in the reference section of my report that discuss the principals and theories that support my analysis into identifying rubber reversion

and lack of sufficient antidegradants opinion. I also utilize patents as a part of my reference materials. Firestone patent U.S. 4609510 defines deterioration of a rubber bag utilized in the tire manufacturing process as reversion which normally occurs because of oxidation. This definition by Firestone coincides with my analysis into the reversion of rubber in tires.

During the examination of the subject tire I also found that the failure surface displayed liner pattern marks present on the belt skim material. During the manufacturing process, once the steel belts are calendered, the belts are rolled into liners in the tire factory prior to use by the tire builders. These liners, which prevent the steel belts from sticking to one another while being stored, can emboss their liner pattern onto the rubber. Evidence of liner pattern marks on the belt skim in the tire post-cure indicates that proper bonding did not occur during tire curing, which as in this case can result in belt separation.

As previously discussed, a tire's durability depends on the adhesion between its components and the physical strength of these components to withstand the normal stresses it experiences during use. During the curing process, each piece of rubber must properly bond to its neighbor. If proper bonding is not accomplished, premature failure can occur during the useful life of the tire. Visible liner pattern marks on a tire's post-cure components is evidence of improper bonding between these rubber components as it shows that an original, unbonded interface still remains within the tire, a tire that was supposed to have bonded, or melded, these various components through the extreme heat and pressure of vulcanization, or cure. The liner pattern marks I observed in the subject tire indicates that the tire lacked

proper bonding of the belt skim rubber which contributed to the failure of the subject tire. This is a very serious manufacturing defect which indicates there is very poor quality control at the factory. Further, there is no other explanation for the existence of liner pattern marks since this condition cannot be caused by usage factors. I learned and utilized this concept during my work with Goodyear-Dunlop. Also included in my report are reference materials discussing the significance of liner pattern marks on post-cured tire components.

The above demonstrates that my opinions are capable to being tested and in fact have been tested in their entirety in multiple different ways. My opinions are not subjective but are based upon proven methods and testing including testing done by the federal government. The methodology I used in forming my opinions has been tested, peer-reviewed and are generally accepted in the tire industry. The only thing that is "subjective" is my ability to observe and find specific conditions in tires that layman would not be able to discern due to lack of experience and training. That is inherent in any analysis of a product which involves expert examination.

My opinions are also based upon, derived from and educated by all of the published materials listed in my report, many of which are peer reviewed. I have provided a copy of all of these materials to BFS and will provide a copy to the Court if that would be deemed helpful.

I understand that under a <u>Daubert</u> analysis, a court may consider as a factor the "rate of error" of the techniques I used. In this regard, it is my opinion that the concept of rate of error is not well suited to the concept of forensic tire analysis. The classic "rate of error" concept in science can be illustrated by the following example:

assume that a scientist develops the hypothesis that a certain new method of testing blood is reliable for detecting that a person has ingested a particular type of drug. The scientist develops the blood testing apparatus, and wants to check its reliability including specifically its rate of error.  If the test is run repeatedly in a controlled environment where it is known whether a person ingested the particular drug or did not ingest a particular drug, an error rate can be determined from the number of times the test reports a false positive or a false negative.  That is a classic example of rate of error that could be easily quantified with repeated testing, with the only question being how many tests to run before a rate of error can be reliably determined.  These concepts simply do not apply in my opinion to a forensic analysis where there is no means to obtain a specific measure of objective cause against which to compare the hypothesis formed through the forensic examination. However, tire companies routinely rely upon this method of analysis to make design and manufacturing changes to their tires, so I would say the rate of error of my techniques is very low.

As shown by documents referenced in my report and by other concepts discussed herein, the techniques I used are well recognized in the tire industry and are used literally every day by tire companies in the field and in the laboratory. Forensic analysis and the other techniques I have used to form opinions in this case were also used by the federal government as reflected in the ODI report.  While at Dunlop, I routinely applied precisely the same principles to my work, using forensic analysis to determine flaws and weaknesses that could be corrected in future production.  If anything, the techniques used in the litigation context have become

even more scientific and even more reliable than the techniques widely used in the tire business, due to the need in the litigation context to meet challenges such as those that elicited this affidavit.

With respect to manufacturing and design defects mentioned in this affidavit and in my report, there were safer, alternative designs and manufacturing processes and know-how available to BFS at the time the subject tire was produced. These meet the litmus test of being both economically and technologically feasible for a tire manufacturer. Had these been employed in the manufacture of the subject tire they would have either eliminated or significantly reduced the likelihood for failure in the observed modes.

These safer, alternative design elements include, but are not limited to:

a.   Application of a nylon cap ply, which was a known and proven tire component at the time of the manufacture of this tire would have produced a benefit in tire durability in the absence of other known and available countermeasures to tread separation failure, in addition to providing a barrier to migrations within the tire under high ambient service conditions.

b.   Chemical modifications for better degradation resistance in the belt skim formulation;

c.   Better component consolidation and stitching to eliminate trapped air;

d.   Better shelf-life quality control of "green" components; and

e.   Better placement of the steel belts.

among possible others. The inherent weaknesses and defects as described above in this tire are contributory to its failure, and therefore a combination of alternative design measures were warranted to elevate the tire's overall endurance.

1 | FURTHER AFFIANT SAYETH NOT":

2

3 | _____
Troy Cottles

4

5 |     SUBSCRIBED AND SWORN TO before me on this the ___7th___ day of
December, 2008.

6

7 |

8 | _____
NOTARY PUBLIC, IN AND FOR THE
STATE OF _Alabama_

9 | County of Limestone

10

11 | MY COMMISSION EXPIRES 1-7-2012

12

13

14

15

16

17

18

19

20

21

22

23

24