# EXHIBIT C

# COURT REPORTERS
## OF AKRON CANTON AND CLEVELAND

## Transcript of the Testimony of
## Brian J. Queiser

**Taken On:** June 10, 2008
**Case Number:** CIV 07-889-PHX-NVW

**Case:** Angel Juarez Moreno, et al., vs. Bridgestone/Firestone, Inc., et al.,

Court Reporters of Akron Canton and Cleveland
Phone: 800-804-7787
Fax: 330-666-9833
Email: reporters@courtreportersinc.com
Internet: www.courtreportersinc.com

**Page 1**

```
UNITED STATES DISTRICT COURT
     DISTRICT OF ARIZONA
           - - -
ANGEL JUAREZ MORENO,        )
individually and as surviving)
spouse, and on behalf of all )
statutory beneficiaries of  )CONFIDENTIAL
ANTONIA DE SANTIAGO CASTILLO,)PURSUANT TO
deceased; et al.,           )PROTECTIVE ORDER
       Plaintiffs,          )
   vs.                      )CASE NO.
BRIDGESTONE/FIRESTONE, INC.,)CIV 07-889-PHX-NVW
an Ohio corporation;        )
BRIDGESTONE/FIRESTONE NORTH )DEPOSITION OF
AMERICAN TIRE, L.L.C., a    )BRIAN J. QUEISER
Delaware limited liability  )TAKEN
company; BRIDGESTONE AMERICAS)JUNE 10, 2008
HOLDING, INC., a Nevada     )
corporation; BRIDGESTONE    )
CORPORATION, a Japanese     )
corporation; BLACK AND WHITE)
CORPORATIONS I-X; BLACK AND )
WHITE PARTNERSHIPS I-X; JOHN)
DOES 1-10,                  )
       Defendants.          )
```

**Page 2**

Videotaped deposition of BRIAN J. QUEISER, a witness herein, called by the Plaintiffs for Examination pursuant to the Federal Rules of Civil Procedure, taken before me, the undersigned, Binnie Purser Martino, a Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public in and for the State of Ohio, pursuant to Notice and agreement of counsel at the offices of Court Reporters of Akron, Canton and Cleveland, 221 Springside Drive, Akron, Ohio, on Tuesday, the 10th day of June, 2008, commencing at 9:18 o'clock a.m.

**Page 3**

APPEARANCES:

On Behalf of the Plaintiffs:
  SICO, WHITE & BRAUGH, L.L.P.
BY: Roger S. Braugh, Jr., Attorney at Law
  900 Frost Bank Plaza
  802 North Carancahua
  Corpus Christi, Texas 78470
  361/653-3300

On Behalf of the Defendants
Bridgestone/Firestone, Inc.,
Bridgestone/Firestone North American Tire,
L.L.C., Bridgestone Americas Holding, Inc.,
and Bridgestone Corporation:
  HERRICK, FEINSTEIN LLP
BY: Susan T. Dwyer, Attorney at Law
  2 Park Avenue
  New York, New York 10016
  212/592-1403

- - -

**Page 4**

INDEX

EXAMINATION                    5

Plaintiff's Exhibit 1          9
Plaintiff's Exhibit 2          47
Plaintiff's Exhibit 3          71
Plaintiff's Exhibit 4          183
Plaintiff's Exhibit 5          183
Plaintiff's Exhibit 6          213
Plaintiff's Exhibit 7          240
Plaintiff's Exhibit 8          259
Plaintiff's Exhibit 9          296
Plaintiff's Exhibit 10         299
Plaintiff's Exhibit 11         318

## Page 29

1  things that you were trying to overcome?
2  A. Yeah. They were footprint optimization,
3  for instance.
4     Maybe if it makes any sense, you know,
5  while you are searching for the desired crown
6  angle of the steel belts, you know, you need to
7  achieve yet the kind of footprint shape that you
8  are looking for and the mold impacts that. And
9  since these are both kind of moving targets, you
10 have to utilize the tools that you have, like
11 finite element analysis to guide you.
12    And so that was really where my expertise
13 was, where I tried to provide it.
14 Q. Was there ever a heat generation problem in
15 the tire?
16    MS. DWYER:    Objection, form and
17 foundation.
18    THE WITNESS:    Not specifically,
19 no.
20 BY MR. BRAUGH:
21 Q. What about generally?
22    MS. DWYER:    Same objection.
23    THE WITNESS:    No. I mean, I
24 don't have a recollection of a heat generation
25 problem.

## Page 30

1  BY MR. BRAUGH:
2  Q. Was there ever a heat dissipation problem
3  with the tire?
4     MS. DWYER:    Same objection.
5     THE WITNESS:    No, I don't recall
6  working on anything like that.
7  BY MR. BRAUGH:
8  Q. You have also, as I understand it, served
9  as a corporate representative for
10 Bridgestone/Firestone North American Tire, LLC
11 with respect to Radial ATX and Wilderness AT
12 tires; is that correct?
13 A. I have, yes.
14 Q. Now, those tires were the subject of
15 recalls in the past; is that true?
16 A. Yes.
17 Q. And you have testified in cases involving
18 those recalled tires, right?
19 A. Yes, yes.
20 Q. You were one of the people, in fact, who
21 were working very closely, very diligently on
22 the ATX and Wilderness AT issue during that
23 period of time leading up to the recall and
24 during the recall; is that true?
25    MS. DWYER:    Objection to the

## Page 31

1  form.
2     THE WITNESS:    A lot of people
3  were. And I was part of the company that was
4  focused on trying to figure out what the cause
5  was and how to resolve it.
6  BY MR. BRAUGH:
7  Q. As a corporate representative for
8  Bridgestone/Firestone North American Tire, LLC,
9  have you ever once admitted that a defect
10 existed in a tire manufactured by that company?
11 A. Well, I believe I have. I have been asked
12 if I have made tire -- particularly examined
13 tires and found anything defective about any
14 tire, similar to questions like you have just
15 asked me, and I have, yes.
16 Q. I said, have you ever testified that a
17 defect existed in a tire?
18 A. Yes. I have given those examples before,
19 yes.
20 Q. Okay. Do you admit, acknowledge and agree
21 that defects existed in the recalled Radial ATX
22 and recalled Wilderness AT tires?
23    MS. DWYER:    Objection, form and
24 foundation.
25    THE WITNESS:    Well, in the sense

## Page 32

1  that the one -- the defective conditions that I
2  am aware of were very isolated and very few, in
3  the sense that the entire product lines or tire
4  sizes, the ones that we recalled, whether they
5  were defective, we could not find that they
6  were, despite all of the research and analysis
7  that we did.
8  BY MR. BRAUGH:
9  Q. So your belief and view is that there is
10 not a design defect in the Radial ATX or
11 Wilderness AT tires that were recalled; is that
12 true?
13 A. Right, not specifically, that's right.
14 Q. But you will admit that they were recalled
15 because of an alleged design defect?
16    MS. DWYER:    Objection to form.
17    THE WITNESS:    Well, they were
18 recalled because we didn't know what was causing
19 accidents of Ford Explorers. We were faced with
20 a history of accidents that certainly appeared,
21 in all probability, was going to just continue
22 to get much worse. And in August of 2000,
23 before we knew what the cause or causes of this
24 situation was, we simply wanted to remove the
25 tires from the field. So that is what we did.

**33**

BY MR. BRAUGH:
Q. So if it were up to you, and you had sole decision-making authority and could go back in time to the 2000 and 2001 time frame, you would advise the company not to recall the Radial ATX and Wilderness AT tires, correct?
  MS. DWYER: Objection to the form, mischaracterizes his testimony.
  THE WITNESS: I don't think we would change what we did, knowing what we learned, and still having some questions that, you know, remain unanswered, it would still be very hard to make any other decision than we made, you know, if not for just the benefit of our customers and out of concern for their safety.
BY MR. BRAUGH:
Q. Well, why would you recall nondefective tires?
A. Well, the simple answer is that there were accidents occurring, and the tires seemed like the kind of thing that if we simply removed them and replaced them, we could mitigate the accidents.
  As time has gone by, I think that that is

**34**

debatable, whether -- the success of that could be debated.
  But it was really the only choice we had, frankly.
Q. So if I can show you that accidents were happening with Steeltex tires, you would recommend and counsel the company to recall those as well?
  MS. DWYER: Objection to the form, foundation.
  THE WITNESS: Well, we know as a tire company that when tires fail, accidents can happen. I think we evaluate it, as does the Government, on a basis of whether the accidents are disproportionate to the experience that we as a tire company have or the industry has.
  And it is also fair to say too that if a tire failure happens, it is not a given, by any sense, that an accident will occur.
  So those factors all have to be taken into account, as you assess a tire's product performance in the field.
  MR. BRAUGH: Objection, nonresponsive.

**35**

BY MR. BRAUGH:
Q. You had stated to me that accidents were happening with the ATX and Wilderness AT tires, and even though in hindsight and retrospect, you can't go back and find a design defect that would justify recalling all of those millions of tires, you would still, nonetheless, counsel the company to go forward with that recall, even with the hindsight that you have today, because accidents were happening, right?
  MS. DWYER: Objection to the form.
  THE WITNESS: If you are recapping what I said, I think the only thing, you know, that I would add to that or try to explain better is it was the rate of these accidents, it was -- you know, the particular tires that we recalled in August 2000 were among the most popular and most prolifically produced tires ever. And a design defect would be in every one of them by design.
  But it was a very small fraction of a percent of tires that were having failures, and a smaller fraction of that were vehicles that were having accidents, and it's -- the vehicle

**36**

behavior is an integral part of the accident.
  You carry a spare tire under the presumption that if you have a tire failure, you can apply your spare. You wouldn't carry a spare if it was presumed that if you have a tire failure, you are just going to have an accident, so why bother carrying a spare.
  With that in mind, with so few on a percentage basis, we certainly weren't looking at a design defect, we were looking at something far more complex, which was really -- the sum of it is that it was a complex issue with no easy solution, beyond making it stop as well as -- best we could at that time, which was just simply to replace tires at that moment and conduct an extensive recall.
  MR. BRAUGH: Objection, nonresponsive.
BY MR. BRAUGH:
Q. Would it be true and fair of me to say that you have never once in your life testified that a design defect existed in any Firestone-manufactured tire?
A. Well, I think that is true. I don't recall ever having testified to that.

36 (Pages 141 to 144)

141

1  of a nylon cap ply to a particular tire?
2  A. Right.
3  Q. Which tire was that?
4  A. Well, we were talking about -- I was
5  thinking about load range Es, so I don't think
6  load range Ds ever had any -- they were never --
7  there were no trade specs created for load
8  range Ds.
9  Q. So the tire that eventually got a nylon cap
10 ply was the load range E Steeltex A/T tire,
11 correct?
12 A. LT265/75R16, that is what I am thinking of,
13 yes.
14 Q. Did any other models of Steeltex get cap
15 plies, nylon cap plies at any point in time?
16 A. They did. We started a process in -- I
17 think we started it as early as late 2000, or
18 early 2001, of changing our tire designs, our LT
19 metric tire designs, among others, and I think a
20 number of -- quite a number of them were
21 Steeltex brands, you know, the different models,
22 different sizes and models.
23 Q. Was there a study or an internal discussion
24 that took place at Firestone at all that
25 pertained to the use of nylon cap plies in these

142

1  tires?
2  A. Well, there was some work done, sure. We
3  had to design the changes into the tires. It
4  required new molds, I think, in many cases.
5      But I am not sure where else to go with
6  that.
7  Q. Aside from the documentation of the changes
8  to the specs themselves and redesign of the
9  molds and things like that, what internal
10 discussion took place regarding the decision
11 itself to begin using nylon cap plies?
12 A. I guess I don't recall anything terribly
13 specific. There may be documents surrounding
14 the decision-making process or the initiation
15 of, I guess the way I would put it is an
16 examination of what tires are we producing and
17 which ones are we going to continue to produce
18 and which ones should we begin the changes to
19 first.
20     I believe we started with trade tires
21 first, so I think there is -- my recollection is
22 that there are discussions centered around that
23 aspect of it.
24     I know we were concerned about the
25 prospective changes that the Government was

143

1  going to make to their test requirements, the
2  regulatory requirements for passenger and light
3  truck tires, which they ultimately did.
4      But there may be discussion like that
5  surrounding those facets.
6  Q. So give me, if you could, an overview, or I
7  guess a thumbnail sketch, of why Firestone
8  decided to start putting nylon cap plies in
9  certain load range E Steeltex A/T tires.
10 A. Well, nylon cap plies or cap strips, I
11 guess it depended, there was really no one set
12 way, at least I don't think it ended up being
13 one set way.
14     But the addition of a nylon cap ply or a
15 cap strip or both was intended to be part of a
16 process of changes, a number of changes that
17 were intended to be sure that our products were
18 ready when the time came that the regulatory
19 requirements were going to change.
20     We foresaw, for instance, more
21 restringent -- more restrictive high speed
22 testing requirements, for instance. Light truck
23 tires were not required to be tested for high
24 speed by the Federal Government unless they were
25 14 1/2 inch or lower in rim diameter. So like

144

1  the 16 inch tire in this case was not required
2  to pass a Government high speed test.
3      We saw a Government high speed test coming
4  down the pike and we didn't know what form it
5  would take, but the company wanted to be
6  prepared for just about any contingency, so that
7  there would be no disruption to our tire
8  production capabilities.
9      We started with trade tires first, because
10 that is where we have the most flexibility. We
11 don't have to ask a car company if we can change
12 the construction in a trade tire, we can just do
13 it to the trade tire. So we started there.
14     And then we did start a process, I believe,
15 for some of the original equipment tires, we
16 approached the car company and said, "We want to
17 begin a conversion process, you know, start a
18 new development process." That is what we did
19 for GM, for instance.
20     With Ford, frankly, we suspended our
21 business with them in May of 2001, so we weren't
22 focusing on redeveloping product for Ford after
23 that.
24     And with the other OEMs, I guess I would
25 have to refresh my memory. I don't remember

145

1   offhand. We probably actually didn't have any
2   other OEMs taking light truck tires that I can
3   think of at the moment.
4   Q. So are you saying that the only reason
5   nylon cap plies were added to load range E LT265
6   Steeltex tires, Steeltex A/T tires, was in
7   anticipation of a regulatory change which would
8   add a high speed test to the battery of tests
9   that the tire would have to pass to be sold?
10  A. Yeah, that is the primary impetus for it.
11  We had the Government regulatory matter. We
12  also did have a desire to create, I want to say,
13  an equivalent, essentially what we ended up
14  referring to global standards for tire
15  construction.
16      Throughout the '90s, we were trying to
17  implement a process of making changes to our
18  products so that they could have some
19  interchangeability so that we had more
20  flexibility in production, tire production.
21      And as the '90s wore on and we were
22  successful at doing that, the economies of scale
23  globally began to be more of a target and we
24  wanted to have, particularly with our parent
25  corporation, or even in Europe or South America,

146

1   we wanted to have some, I want to say, economies
2   of scale associated with supply of raw
3   materials, whether it is steel cord or body or
4   nylon, and have standards, certain materials
5   that were common among these different markets,
6   so that we would have the flexibility of design
7   and manufacture as the decade -- you know, has
8   continued on.
9       So standardization was part of it too. And
10  that is why, you know, we started making other
11  changes, too, to our tires.
12      For instance, I am not so certain about
13  light truck tires, but, for instance, on the
14  passenger car tire side, you know, we started
15  changing steel cords, for instance, to be more
16  uniform with our usage of different steel
17  throughout all of our products throughout the
18  world. So that was another element to it.
19      MR. BRAUGH:    Objection to the
20  nonresponsive portions.
21  BY MR. BRAUGH:
22  Q. The LT265 load range E Steeltex A/T tires,
23  your testimony is that a nylon cap ply was added
24  to them at what point in time?
25  A. I guess -- sorry. I guess I am not

147

1   certain, as I sit here. If I had to just -- it
2   is more than a guess. But it is probably 2002,
3   maybe 2003. But I am not entirely certain.
4   Somewhere in that range.
5   Q. But Firestone would have documents showing
6   the exact date?
7   A. We would have the specs, sure, and that is
8   just what I can remember at the moment.
9   Q. Firestone would also have internal
10  documents that talk about or discuss this change
11  to begin using nylon cap plies in these tires?
12      MS. DWYER:    Objection to form,
13  calls for speculation.
14      THE WITNESS:    Well, I know I have
15  seen some documents that refer to, you know, the
16  types of changes that I have mentioned.
17      So, I mean, there are some things.
18  BY MR. BRAUGH:
19  Q. Firestone should have documents talking
20  about the anticipated effect of adding a nylon
21  cap ply to tires, such as the load range E
22  Steeltex A/T?
23      MS. DWYER:    Objection; form,
24  calls for speculation.
25      THE WITNESS:    I don't know how

148

1   much on point they would be on that.
2       I know we did -- you know, there is
3   testing, and I know that the documents -- any
4   testing documents would probably belie, you
5   know, what the effect was. But I can't think of
6   a document that I have seen, that I can recall,
7   anyway, that expresses it that way.
8   BY MR. BRAUGH:
9   Q. When a design change such as the addition
10  of a nylon cap ply is anticipated or studied,
11  cost is always a consideration, is it not?
12      MS. DWYER:    Objection to the
13  form.
14      THE WITNESS:    Well, sure. I
15  mean, we have to consider material cost. But
16  beyond material cost, there is productivity and
17  efficiency. Those are harder things to put your
18  finger on, you know, to assess a cost.
19      I think for us at the time in 2000 or
20  2001, when we embarked on this, I think the
21  bigger issue for us at the time were molds. And
22  there is a cost associated with that too.
23      You know, we need to have the right
24  tooling. We say tooling, but you need to have
25  the right molds to be able to, you know, even

84 (Pages 333 to 334)

```
                                          333
 1
 2
 3        I, BRIAN J. QUEISER, do verify that I have
 4   read the foregoing transcript consisting of 334
 5   pages and have had the opportunity to make
 6   corrections/changes; and that the foregoing is a
 7   true and correct transcript of my testimony
 8   given June 10, 2008.
 9
10   Corrections/Changes Made ____
11
12   No Corrections/Changes Made ____
13
14
             _____
15                BRIAN J. QUEISER
16
17      Sworn to before me, _____,
                              Notary Public
18
      this ____ day of _____, _____.
19
20        
21
             _____
                    Notary Public
22
      My commission expires _____.
23

24              - - -

      bpm
25
```

```
                                          334
 1            C E R T I F I C A T E
 2
     STATE OF OHIO,  )
 3                   ) SS:
     SUMMIT COUNTY,  )
 4
          I, Binnie Purser Martino, a Registered
 5   Diplomate Reporter, Certified Realtime Reporter
     and Notary Public within and for the State of
 6   Ohio, duly commissioned and qualified, do hereby
     certify that the within named witness, BRIAN J.
 7   QUEISER, was by me first duly sworn to testify
     the truth, the whole truth and nothing but the
 8   truth in the cause aforesaid; that the testimony
     then given by him was by me reduced to Stenotypy
 9   in the presence of said witness, afterwards
     prepared and produced by means of Computer-Aided
10   Transcription and that the foregoing is a true
     and correct transcript of the testimony so given
11   by him as aforesaid.
          I do further certify that this deposition
12   was taken at the time and place in the
     foregoing caption specified, and was completed
13   without adjournment.
          I do further certify that I am not a
14   relative, employee of or attorney for any party
     or counsel, or otherwise financially interested
15   in this action.
          I do further certify that I am not, nor is
16   the court reporting firm with which I am
     affiliated, under a contract as defined in Civil
17   Rule 28(D).
          IN WITNESS WHEREOF, I have hereunto set my
18   hand and affixed my seal of office at Akron,
     Ohio on this 18th day of June, 2008.
19
20
21
22
23
         _____
24           Binnie Purser Martino, RDR, CRR

       My commission expires June 27, 2009.
25              - - -
```